Lisa CRAM, Appellant,

v.

LAMSON & SESSIONS CO., Carlon Division, an Ohio corporation, Appellee.

Lisa CRAM, Appellant,

v.

James ROGERS, Appellee.

Nos. 94–1720, 94–1838.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 17, 1994.

Decided March 15, 1995.

Dorothy A. O'Brien, Davenport, IA, argued (Dorothy A. O'Brien and Charles W. Brooke, on the brief), for appellant.

Scott A. Moorman, Cleveland, OH, argued for appellees; Stephen D. Haufe, Clinton, IA, on the joint brief, for appellee James Rogers, and Thomas H. Barnard and Scott A. Moorman, Cleveland, OH, on the joint brief, for appellee Lamson & Sessions Co.

Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and LOKEN, Circuit Judge.

MAGILL, Circuit Judge.

Lisa Cram appeals from the district court's [1] grants of summary judgment in favor of Carlon Company and James Rogers in these sexual harassment actions brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)–2(a)(1). We affirm.

## I. BACKGROUND

This case concerns a workplace romance gone awry. Lisa Cram started work as an assembly line operator at Carlon Company, a manufacturer of plastic boxes, in June 1991. In December 1991, Cram and James Rogers, one of the rotating staff of foremen in her department, became involved in a consensual romantic affair outside the workplace. Rogers and Cram shared work hours only about one day each week due to the rotation sys-

[1]. The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

tem. Less than two months went by before Cram broke up with Rogers on January 25, 1991, as a result of his mentioning to her that he had had sexual relations with other Carlon employees, Barb Frett and Bonnie Mitchell.[2]

Cram, angry, approached Mitchell at work that evening, and repeated what Rogers had said to her. Mitchell denied ever having had a sexual encounter with Rogers. When the story reached Frett on January 27, she, equally irate, confronted Cram and accused Cram of telling lies about her. The confrontation escalated into a screaming match, in which each woman accused the other of lying and other improprieties. At the end of her shift that day, Cram went to Rogers' apartment, where, unaware of the incident with Frett, he gave her a note saying that he loved her and was sorry for hurting her feelings. The note explained that Rogers in fact only had a single sexual encounter with Frett, whom he had known before working with her at Carlon. Frett had initiated the one-night encounter, appearing at his apartment uninvited. The note also said that he was only joking about Mitchell, and had never had sexual relations with her. Cram showed this note, as evidence of Rogers' perfidy, to Mitchell and other coworkers, and tried to show it to Frett, who was not interested.

During the following weeks, Rogers, in an attempt to recapture Cram's affections, left a few brief notes on the hood of her car and truck asking Cram to speak with him. One of the notes was accompanied by a birthday gift of a plastic flower. When encountering her at work or at the local bar, he asked her why she did not stop by to see him, said that he was sorry, and on occasion changed the station on her workplace radio, suggesting that she listen for certain country and western songs, presumably significant to their relationship. He also drove past her house a few times without stopping his car. He made no sexual comments, threats, or references to her job status.

On February 11, her birthday, Cram stopped by at Rogers' apartment, where she told him that she would like them to be friends, and he gave her a birthday card. Then on Valentine's Day, the two exchanged Valentine cards, and Cram gave Rogers an expensive gold necklace, matching one she wore herself, as a Valentine's Day gift.

In the meantime, the hostility between Cram and Frett and Mitchell continued unabated. Cram tried to apologize to Frett for the January 27 fray, but, in yet another of the displays of temperament that seem to be commonplace in this case, Frett rejected her apology and said that she would take care of the situation herself. Cram took this to mean that Frett and Mitchell intended to complain to management about Cram's behavior and went to tell "her side of the story" to Carlon's office manager, Richard Mineck, on February 20, blaming Rogers for her difficulties with Frett and Mitchell. The next day Mineck and Bill Bowmaster, the fabrication department superintendent, discussed Cram's complaint with Rogers. They reviewed the company's sexual harassment policy with Rogers, and explained to him that coworker dating was strongly discouraged, and that retaliation against Cram for her complaint would not be tolerated. Not to be outdone, on March 4, Frett and Mitchell went to Bowmaster, complaining that Cram was continuing to spread nasty rumors about them among their coworkers. When Mineck, as part of a follow-up plan regarding Cram's February 20 complaint, talked with Cram about the situation, however, she made no complaints to him, instead stating that she had not been at work much recently, and that any problems she had were not work-related.

Things finally came to a head on April 17, when Cram and Rogers both showed up at a local bar called Kilroy's, where they had spent time together during their relationship. Rogers arrived at about 10:30 p.m., and sometime between 11 p.m. and midnight ap-

---

**2.** The brief presented by Cram includes many serious distortions of the facts as presented on the record through the testimony of Cram herself and other persons involved in this matter; these distortions extend far beyond stating the facts in the light most favorable to Cram. We base our recitation of the facts primarily on Cram's own testimony in this appeal of a grant of summary judgment for Carlon.

proached Cram and her group of friends. After "hovering" around, he joined them in their booth and tried to engage Cram in conversation. All parties appear to have been quite drunk. After some time, Cram climbed over Rogers to exit the booth, after which Cram and her friends, including a man Cram had met that evening, Rob Bray, then decided to move on to a restaurant, Maude's. Rogers accompanied Cram to Maude's where Cram became angry because Bray assumed that Rogers was her boyfriend. She told Rogers to leave, using abundant profanity, and explained to Bray that Rogers was not her boyfriend. Bray remonstrated with Rogers about his hanging around Cram, after which Rogers and Bray got into a fracas in which, *inter alia*, Rogers "flipped [Bray] off," Bray threatened to break Rogers' finger, and Rogers picked up Bray's beeper and dropped it in the street. All eventually departed Maude's and returned to their respective homes without actual violence taking place, but, as he was leaving, Rogers said to Cram, "you know I'll get you for this."

On April 24, the first event giving rise to Cram's termination took place. Cram arrived before time for her shift and asked Rogers, who was foreman that day, if she could skip work but punch in and show a "tardy" rather than an absence for the day.[3] Rogers told her that she should ask Bowmaster, because he was not sure if she could receive a "tardy" instead of an absence. Cram said she did not want to ask Bowmaster, and Rogers responded that she could work for fifteen minutes and then leave sick, "but you didn't hear that from me." Cram left, returned at her shift time, and then left again after fifteen minutes without further contacting Rogers, Bowmaster or the lead man that day, who would ordinarily be the person in charge of dismissing a worker early. Under Carlon's policy, leaving work early without first informing a supervisor is grounds for immediate dismissal. At the end of the shift, Rogers asked the lead man if Cram had told him she was leaving; the lead man said that she had not. Rogers nevertheless recorded only that Cram left early on her attendance record.

On April 28, another employee similarly left early after telling Rogers she wanted and intended to leave, but without specifically informing Rogers or another supervisor that she was in fact leaving; Rogers recorded that she left early on her record. Bowmaster met with Rogers to discuss this incident and, seeking advice as to how to handle such situations, Rogers mentioned the fact that Cram had, a few days earlier, also left early without notice to him or the lead man. When Bowmaster reported Cram's actions to Mineck, Mineck issued a five-day suspension notice for Cram, which was sent to Bowmaster as the department head. Bowmaster called a meeting with Cram, Rogers, and the union steward, Melanie Bailey, to hear Cram's explanation of the incident. Cram became upset with Bowmaster, who proposed changing her tardy mark to an absent mark and who felt that she had left work without properly notifying a supervisor. She walked out of the meeting and went to the employee locker room. Bowmaster and Bailey followed her; Bailey said that they wanted to help her, and asked her to return to the meeting. Cram responded that they should "leave [her] alone," and refused to return. After several pleas for her to return, to which Cram did not respond, Bowmaster told her that if she did not return, he would consider it insubordination, and would terminate her employment. She nevertheless did not return to the meeting and left the building.

Bowmaster suspended Cram indefinitely after this meeting, and Mineck and the plant manager then decided to terminate Cram's employment based on her misconduct in leaving work without notice and then refusing to participate in the meeting.

Cram filed suit against Carlon and Rogers, alleging sexual harassment and retaliatory termination. After Cram filed her suit, Carlon discovered that she had falsified her educational qualifications on her employment application form by untruthfully stating that she had completed high school.

The district court granted summary judgment to Carlon on all claims, and soon there-

---

**3.** Under the Carlon system, leaving work early is classified as a "tardy."

after granted summary judgment to Rogers on grounds of issue preclusion. This appeal followed.

## II. DISCUSSION

Cram argues that the district court erred in: (1) failing to properly apply a *Price Waterhouse* mixed motives analysis; (2) failing to apply a quid pro quo analysis; (3) granting summary judgment when a material issue of fact existed regarding hostile work environment; (4) granting summary judgment when a material issue of fact existed regarding retaliatory termination; and (5) resolving disputed material issues of fact in favor of Carlon.[4] On cross-appeal, Carlon argues that the after-discovered evidence of Cram's employment application falsification bars her claims.[5]

■■■ On appeal, we apply the same standard as the district court to a motion for summary judgment. *Kopp v. Samaritan Health Sys., Inc.*, 13 F.3d 264, 268–69 (8th Cir.1993). Summary judgment is appropriate when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Id.* at 268. We resolve all disputed facts and draw all inferences in favor of the nonmoving party. *Id.* at 269.

### A. Cram's Termination

#### 1. Mixed Motives Analysis

■■■ Cram argues that the district court should have applied a mixed motives analysis under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268

(1989), to her claims of discriminatory and retaliatory discharge. We disagree. Under *Price Waterhouse*, plaintiff carries the threshold burden of showing that an illegitimate criterion was a motivating factor in the employer's decision to terminate her employment. *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir.1993) (citing *Beshears v. Asbill*, 930 F.2d 1348, 1353 (8th Cir. 1991)).[6] If the plaintiff makes this showing, *Price Waterhouse* mandates that the burden then shifts to the employer to show that it would have terminated the employee even without the illegitimate criterion. *Id.* To make the threshold showing of illegitimate criterion and shift the burden to the employer, plaintiff must present "evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision [to terminate]." *Id.* 997 F.2d at 449 (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir.1992)). This evidence may be direct or circumstantial, but if it is circumstantial, it must be "tied directly to the alleged discriminatory animus." *Ostrowski*, 968 F.2d at 182. Thus, statements by nondecisionmakers are insufficient to meet plaintiff's threshold burden, as are stray remarks in the workplace by those not involved in the decisionmaking process. *Radabaugh*, 997 F.2d at 449.

■■■ As a matter of fact and law, Cram has not made the threshold showing required to obtain mixed motives treatment of her

---

4. We review this grant of motion for summary judgment de novo, and we examine the facts in the light most favorable to Cram. Under this examination, we find that the district court correctly granted Carlon summary judgment. We find that only two of Cram's disputes with the district court's treatment of the facts have any merit: (1) Cram denied that she told Mineck that things were "fine" at work when he followed up on the February 20 meeting, testifying instead that she said she had not been at work enough to know how things were, and (2) it is not clear from the record whether Rogers said or implied that Cram had to talk to Bowmaster about leaving work early. We resolve these facts in favor of Cram.

5. We do not reach this issue because we find that the district court properly granted summary judgment on other grounds. *See McKennon v. Nashville Banner Publishing Co.*, —— U.S. ——, ——–——, 115 S.Ct. 879, 883–84, 130 L.Ed.2d 852 (1995).

6. *Radabaugh* and some other cases cited in this opinion directly concern actions brought under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634 (1988), rather than under Title VII. The allocation of the burden of proof in ADEA cases is the same as in Title VII cases, and we turn to cases concerning both statutes for guidance. *See Radabaugh*, 997 F.2d at 448.

claim. First, Cram cites no *discriminatory* statements made by any employee of Carlon, worker or management. Statements implying a personal dislike or distrust of Cram herself are not the same as statements found to imply discriminatory attitudes toward women as a group. *See id.* (corporate planning document listing youth of managers as one of company's strengths was evidence of age discrimination); *Ostrowski,* 968 F.2d at 183 (statements by a senior vice president who fired employee that two older employees should have stayed retired, that a 64-year-old employee could not be "superior," and that there was no way a 60-year-old employee could "contribute" was evidence of age discrimination); *and Beshears,* 930 F.2d at 1354 (statements by president and vice president of acquiring company who made decision to fire employee that older employees have problems adapting to changes and new policies and that younger people were more adaptable to their company's policies was evidence of age discrimination). There is no evidence that anyone at Carlon has made statements differentiating women from men as satisfactory employees or ascribing the difficulties with Cram to the fact that she is a woman. Thus, there is no evidence that her termination was based on a discriminatory attitude toward women.

Second, Cram's alleged ill treatment by Rogers and her female coworkers does not meet the requirement that she show discrimination or retaliatory motives of the decisionmakers in her termination. Neither Cram's coworkers nor Rogers had the power to fire Cram, and there is no evidence that Mineck and Bowmaster held any animus against Cram either because she was a woman or because she complained about Rogers. Cram argues that Rogers sexually harassed her, that this harassment would not have occurred were she not a woman, that her rejection of his advances led to antipathy toward her, that this antipathy in turn led to management's discovery of her misconduct in leaving work without notifying a supervisor, and finally that this discovery of her misconduct led to her termination. Therefore, reasons Cram, her termination, not by Rogers but by Mineck and Bowmaster, was discriminatory and/or retaliatory. This attenuated chain of reasoning simply does not provide the showing of discrimination or retaliatory motives of decisionmakers required by our application of *Price Waterhouse:* Cram bases her claim of discriminatory termination on circumstantial evidence that does not "directly reflect the alleged discriminatory attitude" on the part of decisionmakers, but is connected to them only through a series of inferences. *Radabaugh,* 997 F.2d at 448–49 ("Simply because a discriminatory reason might be inferred ... does not mean that a mixed motives case exists" (quoting *Schleiniger v. Des Moines Water Works,* 925 F.2d 1100, 1101 (8th Cir.1991))).

Even if we provisionally accept Cram's claim that Rogers' motive for mentioning her misconduct to Bowmaster was based on discrimination or retaliation, this does not constitute evidence of a discriminatory or retaliatory motive on Bowmaster's or Mineck's part. There is no evidence that Mineck's decision to suspend Cram was based on anything but her misconduct in leaving work, and the issue of termination did not even arise until after her misconduct at the presuspension meeting.

 We find that, as a matter of law, Cram has not made the threshold evidentiary showing required to receive mixed motives treatment of her discriminatory discharge claim.[7]

7. It appears from the record that Cram did not actually bring a claim of *discriminatory* (rather than retaliatory) discharge below. Her brief on appeal is not clear in its merging of these two claims, appearing to argue that the district court should have applied a mixed motives analysis to the discharge on grounds that it was either discriminatory or retaliatory or both. We find that Cram has not met the *Price Waterhouse* threshold on either grounds. When a claim of discriminatory discharge does not meet the *Price Waterhouse* threshold, plaintiff must make a prima facie case of discriminatory discharge, showing that (1) she was within the protected age group; (2) she was performing her job at a level meeting her employer's legitimate expectations; (3) she was discharged; and (4) her employer attempted to replace her. *Radabaugh,* 997 F.2d at 448. Once plaintiff has made her prima facie case, however, defendant can rebut the presumption of discrimination by stating a legitimate reason for discharge. *Id.* This showing by defendant eliminates the presumption created by the prima facie

## 2. Quid Pro Quo and Retaliatory Discharge

▮ Cram next argues that summary judgment is not proper because she can make a prima facie case of quid pro quo sexual harassment, and that the district court erred in failing to consider her quid pro quo theory of the case. The district court questioned Cram's counsel about the quid pro quo theory at the summary judgment hearing, and in its order, found that Cram was terminated as a result of her own conduct, and not because Rogers "had a motive and desire to retaliate against" Cram for her complaint against him. Although the court discusses these issues only in the context of retaliatory discharge, and not quid pro quo harassment, this finding effectively disposes of both theories because both hinge on whether there is a causal link between Cram's relationship with Rogers and Cram's termination. A finding that Cram's own misconduct, and not any action by Rogers, was the basis for her termination eliminates this causal link under both theories, whether Rogers' alleged motive was retaliation for the complaint or retaliation for Cram's refusal to continue their relationship.

▮ To make a prima facie case of quid pro quo harassment, Cram must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulted in a tangible job detriment. *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 186 (6th Cir.), cert. denied, — U.S. —, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992).

There may not exist an issue of material fact regarding factor (2). According to Cram's own testimony, Rogers did not make any *sexual* comments, advances or requests after their consensual relationship ended, and Cram gave him an expensive Valentine's Day gift which indicates that whatever non-sexual advances he made were not unwelcome, at least until the final quarrel at Kilroy's bar. Moreover, even if there is an issue of fact regarding factor (2), there is no issue of material fact regarding factor (4). There is no evidence that Cram's refusal to reinstate her relationship with Rogers resulted in her termination. According to Cram's testimony, Rogers never mentioned her job status or performance in his notes to her or while stopping by her workstation. He asked her to talk with him or to see him after work, but never associated these requests in any way with her job. The interaction with Rogers on the day Cram left work without notification was initiated by Cram, and Cram's own testimony in no way indicates that Rogers brought any personal issues into their discussion of whether she could leave early without an "absence" on her record. Further, Rogers, as Cram requested, recorded a "tardy" for Cram that evening. It was not until Bowmaster came to Rogers to discuss another employee's similar misconduct that anyone with the power to terminate Cram even discovered her misconduct. This sequence of events was not controlled by Rogers. Cram herself initiated it by asking him to circumvent the rules for her, and Rogers accommodated her as far as possible until the question of similar employee misconduct was raised, not by Rogers, but by Bowmaster. To expect Rogers at that point to risk his own status as a supervisor by "covering" for Cram is unreasonable. Rogers could not have planned these events, and he had no input into what disciplinary decisions Mineck and Bowmaster made as a result of Cram's misconduct. Further, Rogers could not possibly have predicted Cram's behavior at the pre-suspension meeting.

case, and plaintiff then carries the burden of showing that the reason for discharge was pretextual. *Id.; St. Mary's Honor Center v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993).

Cram does not argue on appeal that the district court should have applied the above analysis or that there is an issue of material fact regarding discriminatory discharge, as opposed to retaliatory discharge. For the sake of clarity, however, we find that, assuming without deciding that Cram can make a prima facie case of discriminatory discharge, Carlon has stated legitimate reasons for discharge, and Cram has made no showing that these reasons were pretextual.

The only evidence Cram marshalls to show that Rogers was enforcing a quid pro quo against her is that, as he left Maude's restaurant a week before she left work early, he said "I'll get you for this." Rogers made this statement outside of work, as a result of a nonwork-related quarrel. The statement makes no reference to Carlon or Cram's job. There is no implication that he intended to "get her" for her personal rejection of him by interfering in her work at Carlon.

We find that Cram has not shown an issue of material fact on her claim of quid pro quo sexual harassment.

■■■ To make a prima facie case of retaliation, Cram must show that (1) she filed a charge of discrimination; (2) Carlon took adverse action against her; and (3) the adverse action was linked to the filing of the discrimination charge. *Evans v. T.W. Servs., Inc. of Delaware*, 930 F.2d 612, 614 (8th Cir.1991). The discussion of factor (4) in the quid pro quo prima facie case applies equally to factor (3) here. There is no evidence that Cram's termination was linked to her complaint against Rogers. She, not Rogers, Bowmaster, or Mineck, initiated the sequence of events by leaving work without notification, and, rather than suspending her immediately for this infraction, Bowmaster went an extra step in Cram's favor by calling a meeting in which he was prepared to listen to her account of events. Cram's behavior at this meeting, not her complaint against Rogers, led to her termination. The fact that the complaint and Cram's termination were separated by less than three months does not alone establish a link between these events. *See Valdez v. Mercy Hosp.*, 961 F.2d 1401, 1403 (8th Cir.1992).

In addition, it is not clear that Cram's February 20 meeting with Bowmaster regarding her difficulties with Frett, Mitchell and Rogers even amounted to "filing a charge of discrimination" as required by factor (1). No formal charge was made, and Cram's meeting with Bowmaster, according to her testimony, was precipitated not by problems with Rogers, but by her fear that Frett would complain to management about her first.

We find that Cram has not shown an issue of material fact on her claim of retaliatory discharge.

## B. Hostile Work Environment

■■■ Cram argues next that a material issue of fact exists as to whether, regardless of the circumstances of her termination, Rogers' behavior created a hostile work environment in violation of Title VII, and that the district court thus erred in granting summary judgment for Carlon.

■■■ "Unlike *quid pro quo* sexual harassment . . . hostile work environment harassment arises when 'sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" *Hall v. Gus Constr. Co., Inc.*, 842 F.2d 1010, 1013 (8th Cir.1988) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (internal quotations omitted)). Although the behavior creating the hostile working environment need not be overtly sexual in nature, it must be "'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive." *Id.* 842 F.2d at 1014 (quoting *Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir.1986)). In addition, the harassment must be sufficiently severe or pervasive "to alter the conditions of employment and create an abusive working environment." *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir.1982)).

Rogers' workplace interactions with Cram during the period following the breakup of their relationship were brief, sporadic, nonsexual, nonthreatening, and polite. This is far from the showing of sustained, severe harassment required to make a claim of hostile working environment. Rogers only worked with Cram one day each week, and his personal interaction with Cram on those days consisted of changing her radio station and asking her to listen for certain songs, and leaving three brief notes on her car. He did not make physical contact with her, nor

did he use inappropriate language or make sexual or intimidating comments either in person or in the notes. The sole occasion on which Rogers appears to have behaved in an importunate manner was the evening at Kilroy's, which was not in any way work-related, and during which bad behavior seems to have been universal. The behavior Cram complains of is distinctly trivial, and hardly sustained. *Compare Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 334–37 (7th Cir.1993) (supervisor repeatedly asking employee for dates, calling her a "dumb blonde," putting his hand on her shoulder, trying to kiss her, and leaving "I love you" signs in her work area not sustained or serious enough to create issue of material fact on sexual harassment claim) *with Kopp,* 13 F.3d at 269 (doctor repeatedly swearing at female nurses and assistants, calling them abusive names, threatening and on occasion physically harming them created issue of material fact on sexual harassment claim).

Cram appears to argue that, even if Rogers' actions did not create a hostile working environment, his actions led to her .female coworkers creating a hostile working environment, and thus she could defeat Carlon's motion for summary judgment. This argument is meritless. Assuming that Rogers had indeed had a sexual relationship with Frett, and even with Mitchell as well, it was nevertheless Cram, not Rogers, who brought Rogers' letter to the workplace and who confronted Mitchell, which led to the hostility between Cram and Mitchell and Frett. There is nothing in the record to show that there was hostility between Cram and her coworkers until Cram confronted them. Rogers did nothing to bring the relationship between him and Cram to the attention of her coworkers, or to cause her coworkers to dislike Cram.

We find that Cram has not shown an issue of material fact on her claim of hostile working environment.

## III. CONCLUSION

We affirm the district court's grants of summary judgment to Carlon and to Rogers because Cram has not shown that there is an issue of material fact regarding her claims of discriminatory or retaliatory discharge, quid pro quo sexual harassment, or hostile working environment.