Waveney BLACKMAN, Appellant,

v.

VISITING NURSES ASSOCIATION, Appellee.

No. 96–CV–475.

District of Columbia Court of Appeals.

Argued March 20, 1997.

Decided May 1, 1997.

David L. Rose, with whom David M. Wachtel, was on the brief, for appellant.

Henry Morris, Jr., with whom Samuel K. Charnoff, was on the brief, Washington, D.C., for appellee.

Before FARRELL, KING, and RUIZ, Associate Judges.

KING, Associate Judge.

In this appeal from the grant of summary judgment against an employee who claimed she was discharged on account of her nationality and race, we hold that the official who made the decision to terminate the employee for violating company policy is not tainted with the alleged discriminatory animus of the employee's immediate supervisor where the immediate supervisor was not involved in the decision to terminate but only provided the decisionmaker with information about conduct by the employee which violated company policy. Therefore, we affirm.

## I.

Waveney Blackman was born and raised in Guyana and is of African descent. She had been employed for five and one-half years as an account representative in the billing department of the Visiting Nursing Association ("VNA"). She received a "proficient" rating in an April 1994 job evaluation. Her immediate supervisor in the VNA billing department was Irene Barnes, an African–American woman born and raised in the United States. Barnes supervised a total of five employees at the time of Blackman's employment, all of whom were of African descent, and all but one born and raised in the United States. Linda Maurano, who is Caucasian, was the President of VNA at all times pertinent to

Blackman's allegations which led to the instant action.

Early in 1994, Blackman requested two weeks annual leave to be taken in August 1994, so that she could travel to Guyana. Barnes approved this leave in the spring of 1994. Blackman had a chronic condition in her left knee which flared up in July 1994. Blackman's condition was evident to her co-workers and to Barnes. On Tuesday, July 26, 1994, Blackman had an appointment with Dr. Robert Collins to have her knee examined. Dr. Collins treated her knee, prescribed medication, and requested that Blackman schedule a follow-up appointment. Although the medical report from Dr. Collins stated that Blackman was "probably going to need arthroscopic surgery," Blackman later maintained that Dr. Collins told her that she was definitely going to have surgery on her knee. Immediately after seeing Dr. Collins, Jules Proctor, an assistant in Dr. Collins's office, prepared a medical leave slip for Blackman which authorized medical leave from August 1, 1994, to August 5, 1994. Blackman asserts that Proctor signed Dr. Collins's name to the form and that he assured Blackman he was authorized to do so. According to Blackman, Proctor initially wrote the date of her examination, July 26, 1994 (Tuesday), on the medical leave form, but changed it to July 29, 1994 (Friday).

Blackman worked on both the following Wednesday and Thursday (July 27 and 28) of that week. Blackman also went to work on Friday, July 29, 1994. Because Barnes was away on vacation, Blackman left several items on Barnes's desk, including the medical leave form, the time sheets, and a written request to substitute five days of sick leave, as prescribed on the medical leave form, in lieu of the first week of annual paid vacation. Blackman included a note on her leave form stating that she was to have knee surgery "as a result of dislodged cartilage in my knee." Blackman then departed for Guyana.

Barnes returned from her vacation the following Monday, August 1, and found the documents left by Blackman. After reviewing the medical leave form, Barnes observed that the date on the form had been altered and that the form was not completed in full.

According to Barnes, she also determined that Blackman had left the documents on her desk during the morning hours of Friday, July 29, which puzzled Barnes because she had approved three and one-half hours of sick leave for Blackman's doctor's appointment for the afternoon of July 29, 1994. Barnes then brought Blackman's altered medical leave form and the information concerning the discrepancies surrounding Blackman's three and one-half hours of sick leave to the attention of Maurano, VNA's President.

At Maurano's request, VNA's Human Resource Generalist, Lisa Sunderland, investigated the various discrepancies and contacted Dr. Collins. According to Sunderland, Dr. Collins stated that he did not issue a medical leave form to Blackman and that he did not provide authorization for one to be signed on his behalf. He also stated that Blackman was not scheduled for knee surgery, and that he examined and treated her knee on July 26, 1994, not July 29, 1994, the date written on the medical leave form. Sunderland reported her findings to Maurano. Maurano also determined that Blackman had not accrued enough paid vacation time to cover her two week's vacation.

With this information, Maurano directed Sunderland to prepare a final paycheck for Blackman and a notice of termination stating that Blackman was being terminated for "gross misconduct" under VNA's employment policy. According to this policy, "gross misconduct" occurs when an employee is found to have "falsifi[ed] any company record or report," or when an employee has committed "theft or misuse of company property or funds," and calls for the employee's immediate dismissal. The termination notice set out the specific grounds for Blackman's termination: (1) "Falsification of VNA documents, including Leave Request forms and Time Sheets," and (2) "Attempt to fraudulently obtain a benefit payment by the VNA, to wit, using accrued Sick Leave in place of Annual Leave or Leave Without Pay."

On August 15, 1994, after returning to work following her vacation in Guyana, Blackman was called into a meeting with Maurano to discuss the altered medical leave

form and the circumstances leading up to her August leave. Barnes was also present at that meeting. Maurano advised Blackman that she was being terminated for gross misconduct. VNA asserts that Blackman was given an opportunity to respond to the gross misconduct charge, but that she failed to offer any "satisfactory" explanation. Maurano then presented Blackman with the termination notice and her final paycheck. Maurano averred in an affidavit that she "made the decision to terminate [Blackman's] employment and did not obtain a recommendation from Ms. Barnes as to whether [Blackman's] employment should be terminated, prior to making this decision." There is no evidence in this record to refute either averment.

On January 23, 1995, Blackman filed the instant complaint asserting that her termination from VNA was the result of Barnes's discriminatory animus towards Blackman, and that VNA terminated her employment in violation of the District of Columbia Human Rights Act, D.C.Code § 1–2512 (1992 & 1996 Supp.).[1] Blackman alleged in her complaint, *inter alia*, that Barnes had stated publicly to Blackman and other VNA employees her dislike and distrust of "foreigners,"[2] and that VNA was aware of the condition of her knee before she left on vacation. VNA's motion for summary judgment was granted, without a written opinion, by Judge Eilperin on February 28, 1995. This appeal followed.

## II.

### A. Standard of Review

■ We review *de novo* a grant of summary judgment, *Osei–Kuffnor v. Argana*, 618 A.2d 712, 713 (D.C.1993), although we use the same standard used by the trial court in ruling upon the motion. *Simard v. Resolution Trust Corp.*, 639 A.2d 540, 549 (D.C. 1994). Viewing the record in the light most favorable to the appellant, *International Bhd. of Painters v. Hartford Accident & Indem. Co.*, 388 A.2d 36, 42 (D.C.1978), we must determine whether there are material facts in dispute, and whether the employer is entitled to judgment as a matter of law. *Davis v. Gulf Oil Corp.*, 485 A.2d 160, 164 (D.C.1984); *see also O'Donnell v. Associated General Contractors, Inc.*, 645 A.2d 1084, 1086 (D.C.1994).

■ In order to survive a motion for summary judgment, Blackman was required to establish a prima facie case that she had been terminated because of her national origin or race. If such a showing is made, the burden shifts to the employer to articulate a legitimate basis for the employee's termination. If the employer articulates a legitimate, nondiscriminatory basis for the employee's termination, the burden shifts back to the employee to demonstrate that the employer's action was pretextual. Although the burden of production may shift from the employee to the employer and back to the employee, the employee retains the ultimate burden of persuading the finder-of-fact that the employer acted with discriminatory animus. *RAP, Inc. v. District of Columbia Comm'n on Human Rights*, 485 A.2d 173, 176 (D.C.1984).

■ In order to establish a prima facie case of discriminatory discharge, Blackman must demonstrate that (1) she belongs to a protected class; (2) that she was qualified for the job from which she was terminated; (3) that her termination occurred despite her employment qualifications; (4) and that her

---

1. The complaint contained two counts: (1) Violation of the D.C. Human Rights Act, and (2) Defamation. VNA moved for summary judgment on both counts. Blackman did not oppose VNA's motion on the defamation claim, and she has not appealed the court's grant of summary judgment on that count.

2. Blackman alleged that Barnes made the following discriminatory statements: "I hate these goddam foreigners"; "[Blackman is] a very ignorant woman"; referring to a friend of Blackman's, also from Guyana, "you come in all shades, you all look so different"; and to Blackman's son, "I thought you would have had a big Afro like all the foreign boys wear it. You cut your hair like an American boy"; "These damn foreigners ... [they] think they're better than others ... [they] take opportunities from people who have lived here all their lives." Barnes represents in her brief that she did not make any of these statements, and for our purposes we take the disagreement on whether the statements were made to be a disputed fact. As we explain *infra*, however, it is not a disputed *material* fact.

termination was based on the characteristic that placed her in the protected class. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973);[3] *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 (D.C.1993); *Wilson v. Stroh Cos., Inc.,* 952 F.2d 942, 945 (6th Cir. 1992) ("The plaintiff must produce evidence sufficiently strong to raise an inference that the employer's conduct was racially motivated") (citations and internal quotations and omitted). Because she claims that she was terminated from VNA because of her nationality and race, to survive summary judgment Blackman must establish that causal connection with credible evidence. As one court has explained:

> To make the threshold showing of illegitimate criterion and shift the burden to the employer, plaintiff must present evidence of conduct or statements by persons involved in the decision making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision to terminate. This evidence may be direct or circumstantial, but if it is circumstantial, it must be tied directly to the alleged discriminatory animus. Thus, statements by nondecision makers are insufficient to meet plaintiff's threshold burden, as are stray remarks in the workplace by those not involved in the decisionmaking process.

*Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 471 (8th Cir.1995) (first omission in original) (internal citations and quotations omit-

ted) (relying on the "mixed motive" analysis in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)).[4]

## B. Alleged Nationality Discrimination

Blackman attempted to establish her prima facie case, based on discrimination based on her nationality, by showing that her immediate supervisor, American-born Barnes, was motivated by discriminatory animus as illustrated by her allegedly public statements denigrating foreigners in general and Blackman in particular. See note 2, *supra.* Barnes's prejudice, Blackman asserts, if not directly communicated to Maurano, was imputed to Maurano during the course of three meetings during which Blackman contends the two discussed the circumstances surrounding Blackman's August leave. Barnes's participation in the decisionmaking process is established principally, according to Blackman, by the fact that Barnes failed to inform Maurano of Blackman's chronic knee problem, that Barnes recommended she visit a doctor to have her knee examined, and that it was Barnes herself who had suggested that Blackman should explore taking sick leave in lieu of annual leave.[5]

Blackman relies on *Dey v. Colt Const. & Dev. Co.,* 28 F.3d 1446, 1459 (7th Cir.1994), and cases cited therein, for the proposition that summary judgment should not be granted in an employment discrimination case where there is "factual information or other input [such as that claimed to have been supplied by Barnes] that may have affected the adverse employment action." We reject Blackman's reliance on *Dey,* however, because we conclude it is distinguishable, for

---

3. This court looks to federal statutes and case law for guidance in deciding cases under the D.C. Human Rights Act. *Arthur Young & Co., supra,* 631 A.2d at 361 n. 17.

4. The Civil Rights Act of 1991, Pub.L. No. 102–166, 105 Stat. 1071, codified at 42 U.S.C.A. §§ 1981–2000h–6 (1991), overruled that part of the *Price Waterhouse* "mixed motive" analysis which relieved the employer of *all* liability when the employer could show a legitimate basis for its decision despite the presence of an illegitimate factor in the decision-making process. *See* 42 U.S.C.A. § 2000e–5(g)(B). That portion of *Price Waterhouse* relied upon by *Cram* as quoted above, however, was unaffected by the 1991 Act.

5. The record is clear that Maurano was well aware of the condition of Blackman's knee, and even if Barnes did suggest that Blackman consider seeking authorization to use sick-leave, Blackman does not allege that Barnes encouraged her to falsify documents to accomplish that goal. It also remains unexplained why the medical leave form, which was prepared after Blackman's examination on Tuesday, July 26, 1994, indicates that she "may return to work on 8–9–94 after further evaluation," when Blackman was able to work on Wednesday, Thursday, and Friday, July 27, 28, and 29.

the reasons discussed below, and because we are persuaded by the reasoning of several other federal cases which hold that the discriminatory animus of an employee's supervisor, who is not involved in the decision to terminate, cannot, as a matter of law, be imputed to the ultimate decisionmaker.

The terminated employee in *Cram, supra,* brought an action against her employer alleging that she was sexually harassed by a company foreman with whom she had an amorous relationship and that her termination resulted from an act of retaliation after she ended the relationship. The foreman had advised the employer that the employee had engaged in job-related misconduct, and the employer's own investigation into the matter confirmed the misconduct which led to the employee's termination. The court found that there was no evidence to support the inference that the employer's decisionmakers were influenced by the foreman's alleged animus, or that the decisionmakers were biased against women. The court concluded that the employee "bas[ed] her claim of discriminatory termination on circumstantial evidence that does not directly reflect the alleged discriminatory attitude on the part of the decisionmakers, but is connected to them only through a series of inferences." *Id.* at 472 (citation and quotations omitted).

The Sixth Circuit in *Wilson, supra,* upheld the grant of summary judgment for the employer in an action brought by a terminated employee who claimed that his termination was the result of his immediate supervisor's racial bias. The immediate supervisor had reported the employee's job-related misconduct to management, but the court was satisfied that it was management's independent investigation confirming the misconduct which led to the employee's termination. The court concluded that there was no evidence showing that management, *i.e.,* the ultimate decisionmaker, was either influenced by the supervisor's racial animus or motivated by considerations of race when it decided to terminate the employee. The court held that "[t]he fact that [the supervisor] brought [the employee's] misconduct to [management's] attention, without more, is

insufficient to support a prima facie case" of discrimination. *Id.* at 946.

Finally, the court in *McDonald v. Union Camp Corp.,* 898 F.2d 1155 (6th Cir.1990), affirmed the grant of summary judgment for the employer in a suit brought by a terminated employee who asserted that his termination was causally related to the age bias of his immediate supervisor who exhibited his bias through several comments about the employee's age. But the court was satisfied that the employee was not qualified for the job and that statements made "by an intermediate level management official [are] not indicative of discrimination when the ultimate decision to discharge is made by an upper level official. Moreover, there is no evidence, nor has [the employee] made such an allegation, that [the decisionmaker] was predisposed to age discrimination." *Id.* at 1160–61 (citations and footnote omitted). Because it concluded that the immediate supervisor did not make the decision to terminate the employee, the court also rejected the employee's assertion that the employer's rationale for terminating his employment, poor job performance, was pretextual for the immediate supervisor's discriminatory statements. "[T]he allegedly discriminatory remarks made by [the immediate supervisor] are not attributable to the ... ultimate decision maker." *Id.* at 1162 (citation omitted).

Applying the holdings in *Cram, Wilson,* and *McDonald, supra,* to the facts here, Blackman has not established a prima facie case of discrimination based on national origin. Supervisor Barnes, the alleged discriminator, did not participate in the decision to terminate Blackman, and Blackman has offered no evidence showing that decisionmaker Maurano was predisposed to bias based on national origin. Therefore, the fact that Barnes reported Blackman's job-related misconduct to Maurano, is insufficient, without more, to infer a casual relation between Barnes's alleged animus and Maurano's decision to terminate Blackman for gross misconduct.

Nor does *Dey, supra,* the case primarily relied upon by Blackman, support her contention that she had established a prima facie case of discrimination and that sum-

mary judgment should not have been granted for VNA. The *Dey* court reversed the grant of summary judgment for the employer, stating that "[s]ummary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Dey, supra,* 28 F.3d at 1459 (citing cases in accord). The court held that, as a matter of law, the employee had established a prima facie case of discrimination that survived summary judgment because the decisionmaker had solicited the view of the employee's immediate supervisor who had provided a negative assessment of the employee's job performance. But the immediate supervisor's recommendation was suspect because the employee's discrimination complaint was based on allegations that she had been sexually harassed by the immediate supervisor, which conduct she complained about to the offending supervisor and to another supervisor who was not involved in the decisionmaker's decision to terminate the employee. The court focused on the immediate supervisor's role in the decisionmaker's decision to terminate the employee and concluded that this circumstantial evidence supported the inference of a causal link between the employee's complaint, the immediate supervisor's animus for the employee and his possible motive to retaliate against her, and the decisionmaker's eventual decision to terminate the employee.

The key factor in *Dey* was the negative recommendation made by the immediate supervisor who held the discriminatory animus against the terminated employee. In contrast, there was no evidence here that Barnes, the asserted discriminating supervisor, participated in the decision making or provided any recommendation to the decision maker regarding the job status of the terminated employee. As the court in *Wilson, supra,* stated: "[t]he determinative question is whether [the employee] has submitted evidence that [the employee with discriminatory] animus was a cause of the termination." *Id.* at 946. Applying that question to Blackman's complaint against VNA, we find the answer to be "no."

There is no evidence in this record, other than speculation by Blackman in her deposition testimony, that Barnes was the cause of Blackman's termination. That Barnes attended meetings with Maurano to discuss Blackman's altered medical leave form and the discrepancies surrounding Blackman's August leave, is insufficient, in and of itself, to create a causal link between Barnes's alleged discriminatory animus and Maurano's eventual decision to terminate Blackman. That is especially so where the officer making the decision stated without contradiction, as Maurano did here, that the decision to terminate was hers alone. Blackman's attempt to establish a prima facie case of discrimination fails because "her claim of discriminatory termination [is based] on circumstantial evidence that does not directly [or indirectly] reflect the alleged discriminatory attitude on the part of" Maurano. *Cram, supra,* 49 F.3d at 472.

## C. Alleged Racial Discrimination

Blackman also contends that she has established a prima facie case of racial discrimination. Under the fourth prong of *McDonnell Douglas, supra,* the employee must show that the protected characteristic, here race, was a substantial factor in the employee's termination. To establish this element the employee must demonstrate that: (1) she was replaced by a person outside of her protected class, or, if the position has remained vacant, that the employer has continued to solicit applications for the position; or (2) that other similarly situated employees, *i.e.,* employees who have committed similar acts of misconduct which the employer alleges was the basis for the employee's termination, particularly those employees not of the terminated employee's race, were not terminated but were instead treated more favorably. *O'Donnell, supra,* 645 A.2d at 1087. Blackman has failed to establish either prong of this test.

First, there is no evidence in the record that VNA has filled Blackman's position with another employee, or that VNA accepted applications for Blackman's position after she was terminated. Further, Blackman has offered no persuasive evidence that would sup-

port a finding that other similarly situated VNA employees found to have committed gross misconduct were dealt with more favorably than Blackman. Indeed the only example put forth by Blackman involved a VNA employee that had committed gross misconduct and was terminated for falsifying records, just as Blackman was. That employee was American-born and Caucasian.[6] Finally, the remaining employees in VNA's billing department, as Blackman concedes, are of African descent, and at least one of the billing department employees was born outside of the United States. In short, there is no record evidence of discrimination against Blackman on account of her race. For all these reasons, Blackman's prima facie case of racial discrimination must fail.

## III.

On the record before us, because Blackman failed to establish her prima facie case of national or racial discrimination, and because there are no material issues in dispute, we cannot say that the trial court erred when it granted summary judgment for VNA. Therefore, the grant of summary judgment is

*Affirmed.*

---

6. In addition, there is no evidence in the record to support Blackman's "reduction-in-force" ("RIF") argument. Nor is there evidence showing that VNA embarked on a RIF strategy, or, assuming such a strategy existed, that VNA applied it discriminatorily on the basis of national origin or race.