**Teresa SOTO, Plaintiff,**

v.

**JOHN MORRELL & CO., Defendant.**

**No. C02–4029–MWB.**

United States District Court,
N.D. Iowa,
Western Division.

Oct. 6, 2003.

---

Jay Elliott Denne, Munger, Stanley E. Munger, Munger, Reinschmidt & Denne, Sioux City, IA, for Plaintiff.

Barry Bach, Leslie R. Stellman, Hodes, Ulman, Pessin & Katz, PA, Towson, MD, Scott C. Folkers, Scott Folkers Law Firm, Sioux Falls, SD, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* ..............................................1153
 A. *Procedural Background* ...............................1153
 B. *Factual Background* ..................................1153
 1. *Soto's first period of employment with John Morrell* ..................1153
 2. *Soto's second period of employment with John Morrell* ................1154

II. *STANDARDS FOR SUMMARY JUDGMENT* ...............................1158

III. *LEGAL ANALYSIS* .........................................1158
 A. *Sexually Hostile Work Environment* ....................................1158
 1. *Did Soto suffer a tangible employment action?*......................1160
 2. *Ellerth/Faragher Affirmative Defense* ...........................1162
 a. *Did John Morrell exercise reasonable care to prevent and promptly correct the sexual harassment?* ......................1162
 i. *Training for company supervisors regarding sexual harassment* ...........................................1164
 ii. *Express anti-retaliation policy* ..........................1165
 iii. *Multiple complaint channels* ............................1165
 B. *Racially Hostile Work Environment* ..................................1166

C. Quid Pro Quo Sexual Harassment .................................... 1169
 1. Failure to exhaust administrative remedies ........................ 1170
 2. Failure to generate issues of material fact as to the elements of
 the claim ...................................................... 1173
 a. Unwelcome sexual advances or requests for sexual favors ........ 1173
 b. Express or implied conditioning of benefits or refusal
 resulting in detriment .................................... 1175
D. Retaliation ...................................................... 1175
E. Iowa Civil Rights Act Claims .................................... 1177

IV. CONCLUSION ................................................... 1179

## I. INTRODUCTION

### A. Procedural Background

On March 16, 2002, Teresa Soto ("Soto") filed a complaint in this court against her former employer, defendant John Morrell & Co. ("John Morrell"), alleging four causes of action: (1) a claim of sexual harassment in violation of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.;* (2) a claim of racial harassment and discrimination under Title VII and 42 U.S.C. § 1981; (3) a claim of retaliation; and (4) pendent state law claims under the Iowa Civil Rights Act ("ICRA"), IOWA CODE CH. 216. Soto filed an amended complaint on June 25, 2003, which added the additional claim of *quid pro quo* sexual harassment. Presently, John Morrell seeks summary judgment in its favor on each of Soto's claims.

Subject matter jurisdiction over Soto's federal claim is proper pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 2000e–5, which provides for original jurisdiction of claims under Title VII in the United States district courts. The court has jurisdiction over the state law claim alleging violations of the Iowa Civil Rights Act ("ICRA") pursuant to 28 U.S.C. § 1367(a), which confers "supplemental jurisdiction over all claims that are so relat-ed to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

The court heard the parties' oral arguments on John Morrell's motion for summary judgment on September 30, 2003. At the oral arguments, plaintiff Teresa Soto was represented by Jay E. Denne of Munger, Reinschmidt & Denne, L.L.P., in Sioux City, Iowa. Defendant John Morrell was represented by Leslie R. Stellman of Hodes, Ulman Pessin & Katz, P.A., in Towsen, Maryland and by Scott C. Folkers, in-house counsel for John Morrell in Sioux Falls, South Dakota. A jury trial on this matter is currently scheduled for November 17, 2003.

### B. Factual Background

#### 1. Soto's first period of employment with John Morrell

Soto, a Hispanic female, was employed by John Morrell on two separate occasions. The first employment period ran from December 30, 1997 through March 26, 1998. During this period of employment Soto was originally assigned to the cold floor,[1] a refrigerated area, where she used a hook to scrape fat off of pork loins. After working in the cold area for a short time, the environment started to aggravate Soto's asthma and she was moved to the 'kill floor'[2] and assigned to work the

---

1. The cold floor is also referred to as the 'cut floor' and the 'cold area' in the record. Defendant's Appendix in Support of Summary Judgment ("Defendant's App."), Doc. No. 31 at APP000004–APP000005.

2. The 'kill floor' refers to the area of the John Morrell facility in which the hogs come off of the trucks live, are slaughtered, and are then sent to various areas of the kill floor where

tripe[3] area. On the kill floor Soto's direct supervisor was foreman Jesus "Chuy" Perez. At that time, Mr. Leonard Tanner ("Tanner") was the superintendent of the entire kill floor. After Soto missed three consecutive days of work in late January 1998 without calling in, she was placed on special probation. In late March 1998 Soto again did not show up for three consecutive days of work, and did not notify John Morrell of the reason for her absence. Soto eventually contacted Mr. Steve Joyce, John Morrell's Human Resource Manager, and informed him that she could no longer come to work as she needed to stay home with her daughter and newly born grandson. When Soto did not return to work for a couple of weeks, her employment at John Morrell was terminated. Soto's first period of employment with John Morrell officially ended on March 26, 1998.[4] While Soto alleges that her supervisors engaged in sexually harassing conduct towards others during this time,[5] she does not allege any such conduct was directed at her specifically.

### 2. Soto's second period of employment with John Morrell

In December 2000, Soto was again in need of employment. After seeing signs at the local Job Service office that advertised open positions at John Morrell, Soto decided she would again like to work for John Morrell. As Soto was interested in returning to the 'kill floor,' she first called Tanner, and told him she would like to return. Tanner told her she would need to fill out an application and re-apply for the position. Soto applied, and was hired back to the kill floor on December 11, 2000. On this date, Soto received an employee handbook, and signed a receipt to that effect. During her initial employee orientation, Soto received John Morrell's sexual harassment and discrimination policy, as well as complaint procedures. This time around, Soto worked a number of positions: (1) 'scissors' position;[6] (2) stick hole;[7] and (3) kidneys. All of these positions require the worker to manipulate sharp or dangerous objects such as knives, hooks, scissors or any combination of the three. Following an accident in March 2001, Soto was assigned to work in a separate area of the kill floor where the meat cuts were packed in boxes with ice, and then taped shut for shipping.[8] Exactly

they are further broken down into various pork products.

3. Tripe is the stomach lining of ruminants, such as cattle or pigs.

4. During the two years in between her employment periods with John Morrell, Soto worked at Meitz Baking, and then at a Subway restaurant.

5. Soto alleges that during her first period of employment, Tanner would joke around in a sexual manner with a couple female coworkers, and that there were rampant rumors that Tanner was sleeping with Christina, also a coworker of Soto's. Soto admittedly did not know Christina personally, and Christina no longer worked at John Morrell when Soto's second period of employment began.

6. When the pig carcases come down the line, they are placed in a supine position. The 'scissors' position entails standing up by the line, and as the carcases pass by, taking the scissors and cutting the torso from the neck through the legs. The "line" is similar to a conveyor belt on a risen platform.

7. Working in the 'stick hole' area entails using a knife to cut a hole in the neck of each pig carcass, followed by cutting the mouth open as the carcass passes by the worker on the line. An employee in this area is also required to cut off bad ears, and cut off ear tags.

8. Also called 'working in icing' or 'the strapper.' Defendant's Appendix, Doc. No. 31 at APP000024–APP000026.

how long Soto remained in the packing area is unclear, but by May 2001 she had resumed regular positions on the kill floor. Soto suffered from two medical ailments that affected her ability to work: asthma and high blood pressure. On account of these medical conditions, Soto either stayed home from work pursuant to doctor's orders, or was sent home from work by the nurse at John Morrell, on numerous occasions. During her second period of employment with John Morrell, employment records show that Soto missed a total of twenty-six days of work.[9]

During her second tenure at John Morrell, Soto claims that the sexually harassing and racially discriminatory conduct was profuse, and on many occasions she was the target. Soto asserts that superintendent Tanner was the alleged primary perpetrator. A sampling of Soto's allegations includes:

- While working on kidneys, which required the worker to be 2–3 feet up off the ground and work with knives, Tanner would come up behind Soto to stare at her. On a couple of occasions Tanner grabbed her calves from behind.
- On a number of occasions Mr Tanner would 'throw' the plaintiff kisses, and repeatedly offer her his phone number.
- While she was working 'scissors,' Tanner took her hand to lead her down from the line, and held her hand while they crossed the work floor to an office.
- On one occasion Soto saw supervisor Mike Hartman grab a female employee by the hips, lay her on one of the tables, and simulate intercourse. The response on the kill floor was one of laughter and encouragement.

- The day after Soto had been sent home for her high blood pressure, Tanner was angry with her. A female co-employee, speaking from personal experience, recommended giving Tanner a hug and a kiss would solve Soto's problems. Soto refused to hug or kiss Tanner.
- Sometime after March 2001, while Soto was working at the strapper, Tanner, foreman Mike Hartman, and coworker Jose Vasquez, approached her and Mr. Tanner told her to "say yes." Mr. Hartman gestured to her to say "no." At the time Soto said "yes." Later Soto approached Mr. Hartman and asked what she had said 'yes' to. Mr. Hartman informed her that she had agreed that she gave Tanner blow jobs every night. Defendant's App., Doc. No. 31 at 000026–000028.
- In March 2001, after Soto was sent home for her high blood pressure, Tanner yelled at her: "You better give me a damn report on your health, and if you don't, don't come back." Defendant's App., Doc. No. 31 at 000032. When Soto asked her physician, Dr. Ann Pick, for the health report Tanner requested, Dr. Pick responded that the information was "personal. What, is he going to want to know your periods next too?" Defendant's App., Doc. No. 31 at 000032.
- On a couple of occasions Tanner would come up behind Soto and untie her apron.
- Tanner had a habit of discussing how he liked 'eating pussy all night long' in front of numerous female workers. Defendant's App., Doc. No. 31 at 000140.

9. While some of the days missed are attributable to Soto's medical conditions and health, on a good number of occasions Soto failed to notify John Morrell of her absence, or of the reason for her absence.

- On occasion, Tanner would reach out towards Soto and wiggle his fingers while saying "muy bueno panoche."[10] Tanner would also exhibit this behavior and language towards other females. Defendants' Appendix, Doc. No. 31 at 000130.

- While working on the line, Tanner once held up a pig's penis and told Soto that it was for her.

- USDA worker Dale had a habit of coming up to female workers, including Soto, and doing one of the following three things: (1) Telling the female employee that she liked to "get eaten out"; (2) yelling "all night long"; or (3) looking at the female workers while sticking out his tongue and wiggling it around. Defendant's Appendix, Doc. No. 31 at 0000217.

- At the end of June 2001, Tanner saw a hickey on the back of Soto's neck. Tanner yelled to the foreman and USDA workers on the other side of the kill floor that Soto had a hickey. Further, Tanner asked her how she got a hickey on the back of her neck, and if she did it 'doggie style.' Tanner continued to comment on how she had done it 'doggie style,' while another foreman yelled "yea doggie style must have been good." Defendant's Appendix, Doc. No. 31 at 000218. Tanner continued to make these comments to her for the next several weeks.

In March 2001, Soto approached Human Resources Manager Steve Joyce about obtaining a transfer from the kill floor to another area. When asked for her reasons for wanting a transfer, she told Joyce only that Tanner was mean to her, and that he didn't like her because she kept missing work and went home early. Soto never mentioned any of the alleged harassing incidents detailed above as reasons necessitating her transfer. Joyce denied Soto's request to transfer, as it was against company policy to transfer 'white hats'[11] absent a compelling reason. Soto again approached Joyce in May or June 2001 requesting a transfer because Tanner was mean to her and made her 'uncomfortable.' Soto did not mention the sexual harassment as a reason for her request. Joyce again responded, using the same rationale as before, that he could not transfer her.

In July 2001, Soto's daughter unexpectedly needed to be picked up from her father's home in Lansing, Michigan. On July 17, 2001, Soto wrote a note to Steve Joyce and Kerry Abel, Human Resources managers, explaining that there was an emergency, that she didn't know how long she would be gone, and requesting them to give coworker, and live-in boyfriend, Antonio Gonzalez, her check. When Gonzalez went to get Soto's check, Tanner told him that Soto was fired and that she would get her check when she came in and turned in her equipment. Gonzalez conveyed this information to Soto. On July 23, 2001, after Soto returned from Michigan, she met with Kerry Abel and two representatives from the union, Ron Haase and Warren Baker. At this meeting Abel told Soto

---

10. "Muy bueno panoche" and "muy bueno panocha" are Spanish slang for "really good pussy" or "very beautiful pussy." Defendant's App., Doc. No. 31 at 000147.

11. John Morrell uses the color of a worker's hat as a badge of seniority. During a worker's first 90–days at John Morrell they can be transferred freely between departments. After a laborer works in a department for 90–days their departmental rights vest, and they are given a white hat. Once a worker gets a white hat, absent extraordinary circumstances, they can only transfer out by bidding out. Defendant's App., Doc. No. 31 at 0000173. Different colored hats are used to designate more senior workers, for example a blue hat would designate its wearer as a foreman.

that Tanner did not have the authority to fire anybody, and he offered her reinstatement to her previous position with backpay, seniority, and benefits. At this time Soto accepted the offer of reinstatement, and agreed to return to work the following day. Soto did not tell Abel of Tanner's alleged harassment at this meeting.

On the afternoon of July 24, 2001, Antonio Gonzalez called Kerry Abel on behalf of Soto. Gonzalez informed Abel that Soto was not returning to work due to Tanner's harassment of Soto. Soto's official last day at John Morrell was July 26, 2001.

On July 25, 2001, Soto met with Abel at John Morrell and told him about Tanner's alleged harassment of her and others, as well as Tanner's inappropriate language and conduct. Abel promised Soto that he would investigate her allegations.

Shortly after Soto met with Abel for the second time, she met with Steve Joyce and told him about Tanner's alleged harassment and inappropriate behavior. Joyce requested that Soto write him a letter detailing the specifics of her allegations. When asked if she wanted Tanner fired, Soto responded that it was not her decision to make.

On August 13, 2001, Joyce received a handwritten letter from Soto setting forth a number of her allegations of harassment by Tanner. Joyce immediately called Soto and asked her to come in and discuss the allegations made in her letter. Abel commenced an investigation into the allegations on that same day. Abel's investigation consisted of a series of interviews of Tanner, three of Soto's other supervisors (Jesus "Chuy" Perez, Mike Hartman, and Jim Cates), coworker Jose Vasquez, and others who were either implicated by Soto's allegations, or could allegedly corroborate Soto's allegations. In his interview, Tanner categorically denied all of the allegations. From these interviews, Abel found insufficient corroboration of Soto's

complaints. No action was taken against Tanner at this time.

On August 30, 2001, another meeting was held between Joyce, Soto, and two union representatives to discuss the details of Soto's allegations. Joyce offered Soto reinstatement of a position, including seniority and benefits, as well as a transfer to a different area of the facility. Soto refused this offer.

On November 5, 2001, Soto filed a charge of discrimination with the Iowa Civil Rights Commission (ICRC), which was cross-filed with the Equal Employment Opportunity Commission (EEOC). Shortly thereafter, John Morrell received a copy of Soto's formal charge.

On November 13, 2001, Joyce met with Dan Paquin, Plan Manager, and Tanner to discuss the allegations in the EEOC/ICRC charge. Tanner changed his story from his previous interview, and admitted some of the conduct alleged. Paquin placed Tanner on administrative leave. Joyce then reinterviewed supervisors Perez, Valdivia, and Hartman, as well as coworkers Teresa Jaimes, Angelina Padilla (aka "Flaca"), Alba Smith, Hong Nguyen, and Santana Lopez.

Shortly after the November 13, 2001, meeting Paquin met with Gary Junso, Director of Human Resources for John Morrell, to discuss the situation. It was determined that Tanner would be fired for his harassment of Soto.

On November 29, 2001, Scott C. Folkers, In-House Counsel for John Morrell, sent a letter to Stanley E. Munger, Soto's attorney, and made an unconditional offer of reinstatement to Soto. This letter stated that Tanner had been terminated, and offered Soto a position in any area of the plant, on any shift, at the same pay, seniority and benefit level as when she left.

Neither Soto or Mr. Munger responded to this offer of reinstatement.

Soto received right-to-sue letters from the ICRC and EEOC on January 18, 2002, and February 7, 2002, respectively. Defendant's App., Doc. No. 31 at 000123–000124.

## II. STANDARDS FOR SUMMARY JUDGMENT

As this court has explained on a number of occasions, applying the standards of Rule 56 of the Federal Rules of Civil Procedural providing for summary judgment, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence to determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). In reviewing the record, the court must view all facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Quick*, 90 F.3d at 1377 (same). Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps. Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff Cty. Ark.*, 7 F.3d 808, 810 (8th Cir.1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and ad-missions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). Finally, this court has repeatedly taken note of the rule in this circuit that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination cases. *See, e.g., Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991)). The court will apply these standards to John Morrell's motion for summary judgment on Soto's claims.

## III. LEGAL ANALYSIS

### A. Sexually Hostile Work Environment

■ As John Morrell does not base its argument for summary judgment, on the

sexually hostile work environment claim, on a failure by the plaintiff to create material questions of fact as to any of the elements of the *prima facie* case, the court need not embark on a lengthy discussion of the elements required to prove a sexually hostile work environment claim. Rather than counter any of the elements of the claim, John Morrell couches it's argument for summary judgment on the rationale that there is no genuine issue of material fact that it is entitled to the *Ellerth/Faragher* affirmative defense to any sexually hostile work environment created by Tanner and other male employees. The Supreme Court, in *Burlington Industries, Inc. v. Ellerth* and *Faragher v. Boca Raton,* established an affirmative defense to employer liability for harassment by a supervisor:

> When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, *see* FED. RULE CIV. PROC. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton,* 524 U.S. 775, 807–08, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "Thus, in the wake of *Ellerth* and *Faragher,* an employer is subject to vicarious liability for harassment by a supervisor, if that harassment resulted in a 'tangible employment

action,' but the employer's liability for harassment by a supervisor is otherwise contingent upon an affirmative defense." *Joens v. John Morrell & Co.,* 243 F.Supp.2d 920, 932 (N.D.Iowa 2003).

The record indicates that Tanner told Soto's boyfriend, and coworker, Antonio Gonzalez, that she was fired, and that based on this conversation, Soto indeed did believe she had been terminated. Soto's belief that she was fired was based on the fact that she had previously seen Tanner fire other coworkers. In Soto's own words: "I seen Tanner fire people, and they get so scared they just go. I seen him do that. I used to interpret for him ... I've seen him do that ..." Defendant's Appendix, Doc. No. 31 at 000060 (Deposition of Teresa Soto at 209, ll. 21–24). Equally true is the fact that Tanner did not have the actual authority to fire anyone. When questioned about the extent of his authority in his deposition, Tanner gave the following response:

Q : Did you have the authority to fire people when you worked for John Morrell in Management?

A: No.

Q : Who had the authority to fire people?

A: That was human resources, Steve Joyce or Kerry Abel.

Defendant's Appendix, Doc. No. 31 at 000265–000266 (Deposition of Leonard Tanner at 31–32, ll. 21–25). In fact, John Morrell employment records echo this fact in that there is no indication that Soto was fired from John Morrell at the time Tanner told Gonzalez she was fired. Also undisputed is the fact that approximately five days after her 'firing' by Tanner, Soto returned to John Morrell's Human Resources department to turn in her equipment, at which time she was informed that Tanner did not have the authority to fire her, or anyone else, and that she was still

employed at John Morrell at her previous pay, benefit, and seniority levels. Both parties concede that Tanner was a supervisor, who had "immediate (or successively higher) authority" over Soto, in the context required to invoke the *Ellerth/Faragher* analysis. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275.

### 1. Did Soto suffer a tangible employment action?

■ Before and employer can assert the *Ellerth/Faragher* affirmative defense, the court must determine whether or not the plaintiff suffered a tangible employment action. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257, *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. If a tangible employment action was taken against the harassed employee, then the employer is foreclosed from asserting the *Ellerth/Faragher* affirmative defense and is subject to vicarious liability. *See Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275. A tangible employment action is generally defined as an action that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits . . . in most cases [it] inflicts direct economic harm." *Joens v. John Morrell, Inc.,* 243 F.Supp.2d 920, 936 (N.D.Iowa 2003) (citing *Ellerth,* 524 U.S. at 761, 762, 118 S.Ct. 2257) (citations and quotations omitted). In this instance, Soto alleges two manners in which a tangible employment action was taken against her: (1) Tanner threatened to fire, and eventually did terminate, Soto; and (2) Tanner gave longer bathroom breaks to those employees that went along with his harassment.

■ Unquestionably, Tanner's mere threats to fire Soto do not rise to the level of a tangible employment action as Soto did not suffer a fiscal or employment related injury because of them. As far as Tanner's termination of Soto, the record suggests that this too fails to rise to the level of a tangible employment action. It is uncontested that Tanner did not have actual authority to fire Soto, or anyone else for that matter. The hiring and firing of employees was allocated exclusively to John Morrell's Human Resources Department. It is true that the record indicates that Tanner told Gonzalez that Soto was fired, that Soto believed she was fired, and that Soto's belief that she was fired was reasonable based on Tanner's apparent authority. However, at the time Soto found out about her 'termination' she was attending to a family emergency in Michigan. The day after her return to Iowa, she went into John Morrell's Human Resources office and requested her check from Kerry Abel. At this time, Soto was informed that Tanner had no authority to terminate her, that she was still employed at John Morrell with the same benefits and seniority, and that she could come back to work the next day. Soto discovered she was not terminated on the exact same day she would have normally returned to work following her absence. Given the timing of events detailed in the record, the court cannot say that Tanner's 'termination' resulted in Soto suffering a significant change in employment benefits rising to the level of a tangible employment action. *See Buettner v. Arch Coal Sales, Inc.,* 216 F.3d 707, 715 (8th Cir.2000), *cert. denied,* 531 U.S. 1077, 121 S.Ct. 773, 148 L.Ed.2d 672 (2001) (finding no adverse employment action where employee was told she was fired by a supervisor, but did not lose pay or other job benefits).

■ Soto next contends that she was denied bathroom breaks by Tanner because she didn't go along with his harassment, and that those who did go along with Tanner's harassment received numerous

and lengthy breaks.[12] Soto's arguments are supported by the following excerpts in her deposition testimony:

A: I noticed that when I didn't go along I would ... either get yelled at more or it would—at the end, before I got fired [by Tanner], *I wasn't even getting any breaks.* I wasn't even getting my breaks, and I was complaining that I was tired, but I had to keep going. But I don't know how to put it....

\* \* \* \* \* \*

A: .... it wasn't so much that my job was hard. I like a challenge. It was that *I wouldn't get breaks* and I was getting yelled at. I mean getting made fun of....

Defendant's App., Doc. No. 31, at 000151, 000155 (emphasis added). Soto also testified that women who would go along with Tanner's harassing behavior would get breaks in excess of 45–minutes. Defendant's App., Doc. No. 31, at 000153. In countering the plaintiff's argument, John Morrell points to Soto's testimony that she was the master of her own breaks and that she could decide when she took breaks:

Q: Mike [Hanson] and Jose [Vasquez], were they your bosses that actually told you, for instance, when you could leave for a break if you needed a break? Or was it Tanner who would tell you when you could leave for a break?

A: It really wasn't anybody. You'd have to see when you were going to go on break. *You tell them.* If you can, you can, I guess, because I don't remember anybody telling me to go on break. I would say, "Mike, I got to go to the bathroom." He's like, *"You don't have to tell me, go "* and then I'd come back.

Plaintiff's Appendix, Doc. No. 38, at 5 (Deposition of Plaintiff) (emphasis added). John Morrell argues that because Soto, and not John Morrell, controlled her breaks that any alleged deprivation in Soto's breaks was not a tangible employment action by John Morrell. At oral argument, the plaintiff claimed that this testimony meant that she controlled *when* she would go on break, but not *the length* of her breaks—which was what Tanner *would* restrict. In further support of its position, John Morrell points to the fact that when other women on the line took longer breaks that Soto was not required to 'pick up the slack' and do the other women's work:

A: Yes. When they used to go on breaks they's stay 45 [minutes], sometimes longer, almost an hour sometimes and [Mike Hartman] goes, "Where's Santana? Where's Flaca?" I forgot her name. And I said, "They're on break," and he said—he told me specifically, he said, "Teresa, when they go out on break, don't do their job. Don't do—they're taking advantage of you. You stay where you're at and do your job."

But I was just doing it to help out. You know, I didn't think about the other break—you know, that's when I was starting, because they tell me, "Watch my stuff, Teresa. I'll be back," and before you know it they'd be gone for a long time, but like I would stay busy to me. But Mike noticed it and he told me not to do other people's work, not—to do my own.

Plaintiff's App., Doc. No. 38 at 26. John Morrell asserts that this statement shows that Soto admittedly was not required to

---

**12.** At the oral argument for summary judgment the plaintiff asserted that Tanner would follow Soto to the restroom and would wait outside the bathroom door to ensure that she would come back to the line right away upon finishing up in the restroom. However, because there is nothing in the record to support this assertion, the court cannot consider it in its analysis.

do 'harder' work due to the alleged discrepancy in breaks between her and her coworkers. The apparently conflicting testimony in the record, and the ambiguous and difficult to understand testimony of the plaintiff makes the determination of whether a tangible employment action occurred at the hands of John Morrell a very close call. However, in a motion for summary judgment the court is required to view the facts in the light most favorable to the nonmoving party, in this case plaintiff Soto. Looking at the facts in the light most favorable to Soto, the court finds that a genuine issue of material fact has been raised as to whether the denial of bathroom breaks, or whether giving Soto exponentially shorter bathroom breaks than other female coworkers on the same line, constituted tangible employment action. Accordingly, the defendant's motion for summary judgment as to whether a tangible employment action was taken is denied.

### 2. Ellerth/Faragher Affirmative Defense

■■ While the court has determined that a genuine issue of material fact exists as to whether the alleged denial of bathroom breaks to plaintiff Soto constitutes a tangible employment action, in the interest of completeness, the court will also address the parties' arguments as to whether John Morrell has made a satisfactory showing as to the elements of the *Ellerth/Faragher* affirmative defense. As briefly mentioned above, where no tangible employment action has been taken the employer can assert the *Ellerth/Faragher* affirmative defense by showing *both* that (1) the employer exercised reasonable care to prevent and promptly correct the harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of available preventative or corrective opportunities provided by the employer, or otherwise avoid harm. *Newton v. Cadwell*

*Lab.*, 156 F.3d 880, 883 (8th Cir.1998) (citing *Faragher* and *Ellerth* ); *see also Sims v. Health Midwest Physician Servs. Corp.*, 196 F.3d 915, 920 (8th Cir.1999); *Todd v. Ortho Biotech, Inc.*, 175 F.3d 595, 597 (8th Cir.1999); *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 889 (8th Cir.1998); *Stricker v. Cessford Construction Co.*, 179 F.Supp.2d 987, 1000 (N.D.Iowa 2001).

### a. Did John Morrell exercise reasonable care to prevent and promptly correct the sexual harassment?

■ The first prong focuses on whether the employer took appropriate steps to prevent and correct the harassment. Though an anti-harassment policy is not *per se* required for an employer to meet this prong, the existence of an *effective* anti-harassment policy will discharge the employer's showing of proof under the first prong. *See Ellerth*, 524 U.S. at 742, 118 S.Ct. 2257; *Scrivner v. Socorro Indep. Sch. Dist.*, 169 F.3d 969, 971 (5th Cir.1999). To be 'effective' an anti-harassment policy must include the following components: "(1) training for the company's supervisors regarding sexual harassment; (2) an express anti-retaliation provision; and (3) multiple complaint channels for reporting the harassing conduct." *Stricker*, 179 F.Supp.2d at 1007; *see also Montero v. Agco Corp.*, 192 F.3d 856 (9th Cir.1999); *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811–12 (7th Cir.1999).

John Morrell's anti-harassment policy is not contained in the employee handbook, but rather, it is an independent document, printed in both English and Spanish, which is distributed to all new employees at their initial orientation and allegedly to each employee on an annual basis thereafter. It reads:

SEXUAL HARASSMENT
STATEMENT

John Morrell and Company is dedicated to providing a work environment free

from sexual harassment or any form of sexual discrimination. As such, the Company is committed to eliminating any form of sexual harassment or sexual discrimination. Sexual harassment is defined by the Equal Employment Opportunity Commission (EEOC) as "unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature". Such conduct becomes actionable when it affects an individual's employment status ("terms and conditions of employment") adversely.

The EEOC's criteria to determine whether an act constitutes unlawful sexual harassment under Title VII of the Civil Rights Act of 1964 includes: unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: 1. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment; 2. Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; 3. Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working atmosphere. The consequences of a legitimate sexual harassment compliant could possible [sic] be Company and/or personal liability.

Sexual harassment or harassment for any reason such as harassment based on race, color, religion, national origin, age or handicap, will not be tolerated from any manager, supervisor or employee and will lead to stern disciplinary action, up to and including discharge. Please immediately contact Steve Joyce, the EEO specialist, 1200 Bluff Road, Sioux City, Iowa 51107, (712–279–7391) to report any incident of harassment. No retaliation will be permitted against any employee or applicant who registers a complaint. Information disclosed on a complaint will be disclosed only to the extent necessary to conduct an appropriate investigation and take proper action.

Defendant's App., Doc. No. 31, at 000257–000258. At her initial employee orientation, Soto signed a form detailing what she was to have received training in at the orientation. Soto signed her name, on December 13, 2000, attesting the following: "I certify that I have received a copy of the Company Policy statement regarding sexual harassment and understand that if I have any problems during my employment I will contact my supervisor or the E.E.O. officer at this facility." Defendant's App., Doc. No. 31 at 000262. In his deposition testimony Steve Joyce indicated that large posters discussing sexual harassment, sexual discrimination and retaliation were posted in the personnel department and the training department. Defendant's App., Doc. No. 31 at 000165–000166. The posters detailed examples of sexual harassment and stated that if an employee "experiences or witnesses sexual harassment, [they should] report it immediately to [their] supervisor or human resource manager." Defendant's App., Doc. No. 31 at 000263. Additionally, John Morrell relies on the following interoffice memorandum from Joseph Sebring, President and COO of John Morrell, that was distributed in July 1998 and August 2001:

Dear Employee:

This letter is intended to remind you of our Company's strict prohibition against any and all forms of "sexual harassment" in the workplace, and to let you know that: (1) we will not tolerate sexual harassment of any kind, whether it is committed by an employee or a supervisor of this Company; and (2) if you believe that you are the victim of any form of sexual harassment at work, you should promptly report any complaints

to your human resources department, which will immediately investigate your complaint and, if found to be true, will take swift action to correct the problem so that you will not be subject to further harassment. (At the bottom of this letter is the name and phone number of the person in your Company whom you should report any such complaints.)
JUST A REMINDER—"SEXUAL HARASSMENT" means:

> a. Any unwelcome sexual advance, pressure for sexual activity, repeated remarks with sexual or demeaning implications, or other verbal or physical conduct of a sexual nature.
>
> b. Any request by a supervisor or manager for sexual favors in exchange for job benefits, and conversely, any threat to your job should you refuse to submit to a supervisor's request for sexual favors.

Any person who complains of sexual harassment, *whether it is committed by an employee or supervisor,* may use the Company's complaint procedure. Filing of a complaint or otherwise reporting sexual harassment will not affect future employment or work assignments, and will be kept in strictest confidentiality, consistent with the Company's legal obligations and with the need to investigate allegations of misconduct and take corrective action whenever this conduct has occurred.

A proven charge against an employee or supervisor of this Company *shall* subject that person to disciplinary action, *including discharge.*
REMEMBER, SEXUAL HARASSMENT IS NO JOKE, AND THIS COMPANY INTENDS TO TAKE IT VERY SERIOUSLY! If you believe you are a victim, contact the person and phone number listed below. WE WILL TAKE IMMEDIATE AND CORRECTIVE ACTION TO PREVENT SEXU-AL HARASSMENT WHENEVER WE LEARN OF IT!

> Sincerely yours,
> Joseph B. Sebring

You may report any complaint of sexual harassment on the job to the following person:

Contact: Steve Joyce Phone: (712)279–7398.
Defendant's App., Doc. No. 31 at 000259–000269 (emphasis in original). In evaluating this interoffice memorandum version of the anti-harassment policy it is important to look at the fact that this memo was distributed in July 1998 and August 2001, whereas Ms. Soto's two periods of employment with John Morrell ended in March 1998 and July 2001, respectively. Steve Joyce even testified that he was uncertain whether Ms. Soto had ever been provided with a copy of this letter, unless she had procured it in one of John Morrell's mass distributions. Defendant's App., Doc. No. 31 at 000168. Therefore, as plaintiff Soto's employment with the company ended, in both instances, before this memo was distributed, it is very likely that she never received this memorandum.

*i. Training for company supervisors regarding sexual harassment.* In its reply brief, John Morrell asserts that the Steve Joyce, Director of Human Resources for John Morrell, testified that John Morrell trains its supervisors annually, reviews the anti-harassment policy and complaint procedures with supervisors, and provides supervisors with a copy of the policy. Defendant's Brief in Reply to Plaintiff's Brief in Resistance to Motion For Summary Judgment ("Defendant's Reply Brief"), Doc. No. 50. at pg. 3. John Morrell's assertions vastly overstate the content of Mr. Joyce's testimony in the record. The following excerpt is the only information about corporate training in Mr. Joyce's testimony:

> Q: What *guidelines or requirements does corporate have for you in terms of*

*what you must do in training,* is there any written policy or guideline saying this is what you must do, this is how you must do it?

A: Not that I'm aware of.

Defendant's App., Doc. No. 31 at 000161 (emphasis added). Joyce's testimony continues:

Q: ... Has corporate ever provided you like a script of what is to be told to employees regarding sexual harassment?

A: No.

Q: Have they ever provided you any policies that say you must do this training with its employees regarding sexual harassment and then provide the training material?

A: No, other than the statements and placards and stuff that I have alluded to earlier.

Q: So they don't have a program that they say this is the program you must teach?

A: No.

Q: *So there's no uniform method of communicating the sexual harassment policy to the employees of John Morrell,* is that correct?

A: I believe that's correct.

Plaintiff's App., Doc. No. 38 at 29 (emphasis added). With regard to distribution of the policy to John Morrell employees, Steve Joyce stated that the handouts and policies are "disseminated to *the folks* on an annual basis, sometimes more than an annual basis." Defendant's App., Doc. No. 31 at 000161. Joyce did not clearly state whether the policy was, or was not, conscientiously distributed to supervisors in particular. Joyce testified that seminars discussing sexual harassment, sexual discrimination investigation, taking complaints, and how to do a proper investigation in a complaint, were put on by John Morrell. However, these seminars were conducted in late 2002 and early 2003, long after Ms. Soto had left John Morrell. Further, it is unclear from the record who attended these seminars and training sessions, whether it was just human resources, or whether all the plant supervisors were in attendance. The record is ambiguous, at best, as to whether sexual harassment training was actually provided to company supervisors. As such, John Morrell is not entitled to judgment as a matter of law that company supervisors were trained in regard to sexual harassment.

***ii. Express anti-retaliation policy.*** While Soto contends that there is no express anti-retaliation policy contained in John Morrell's anti-harassment policy, the record indicates otherwise. The Sexual Harassment Statement plainly states that: "No retaliation will be permitted against any employee or applicant who registers a complaint." Defendant's App., Doc. No. 31 at 000258. As the anti-harassment policy clearly contains an anti-retaliation provision, John Morrell's policy meets this 'effectiveness' factor. *See Miller v. Woodharbor Molding & Millworks, Inc.,* 80 F.Supp.2d 1026, 1030 (N.D.Iowa 2000) (finding that strong anti-retaliation language indicating that reprisals against complaining employees will not be tolerated is required to satisfy this factor).

***iii. Multiple complaint channels.*** On this factor, Soto argues that the Sexual Harassment Statement contains "absolutely no reference to a 'complaint channel' for reporting harassing conduct," and that the Joseph Sebring memorandum only states that employees should report complaints to the Human Resources Department. Plaintiff's Brief at pg. 10. John Morrell urges that both the Sexual Harassment Statement and the Joseph Sebring memorandum provide that complaints should be lodged with Human Resources Director Steve Joyce, and that therefore a complaint channel was established via the anti-

harassment policy. The court initially notes that while John Morrell's policy contains *a* complaint channel (Steve Joyce), this factor plainly requires *multiple* complaint channels. The court notes that the anti-harassment posters stated that complaints could be made to human resource *or* a supervisor, but these posters were placed in only two places, the training department and the personnel department, which made them not highly visible to the majority of John Morrell employees. When asked what John Morrell told Soto, with regard to reporting sexual harassment complaints, at her initial employee orientation, Soto responded:

A: To the next person higher than whoever's doing it.

Q: Was any mention made of the personnel department?

A: Probably, but I don't know because—

Q: In relation to reporting?

A: Probably. I don't know.

Defendant's App., Doc. No. 31 at 000021. So, it appears from the record that John Morrell employees had some knowledge that they could report harassment to someone other than Human Resources. However, any knowledge John Morrell employees may have had that they could report harassment to their supervisors cannot trump, at the summary judgment stage, the fact that the actual policy itself provides only *one* complaint channel. John Morrell is not entitled, as a matter of law, to a finding that multiple complaint channels existed for the reporting of sexual harassment.

Genuine issues of material fact have been generated as to the effectiveness of John Morrell's anti-harassment policy. Specifically, because there are genuine issues of fact as to whether John Morrell's anti-harassment policy is effective under the first prong of the *Ellerth/Faragher* affirmative defense, the court need not delve into whether John Morrell promptly corrected the conduct, or an analysis of the second *Ellerth/Faragher* prong, at this juncture. As this is a matter that is properly left for determination by the finder of fact, John Morrell's motion for summary judgment as to the sexually hostile work environment is denied.

### B. Racially Hostile Work Environment

 In her complaint, Soto asserts that John Morrell discriminated against her based upon her race in violation of Title VII and 42 U.S.C. § 1981. Hostile work environment claims under Section 1981 are analyzed in the same manner as a similar Title VII claim. *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1050 (8th Cir.2002). Further, the Eighth Circuit Court of Appeals has determined that "the same standards are generally used to evaluate claims of hostile work environment based on sexual harassment and racial harassment." *Gipson v. KAS Snacktime Co.*, 171 F.3d 574, 578 (8th Cir. 1999). Accordingly, the plaintiff's claim of racial discrimination under Title VII and Section 1981 is analyzed under the same schematic employed for analyzing a sexually hostile work environment claim.[13]

---

13. Despite the fact that the analysis is the same for both racially hostile work environment claims and sexually hostile work environment claims, the court chose not to combine its analysis of these claims in this case because of the grounds upon which John Morrell alleged it was entitled to summary judgment. As to the sexually hostile work environment claim, John Morrell did not dispute any elements of the claim, but rested its argument on the assertion that it was entitled to the *Ellerth/Faragher* affirmative defense. On the other hand, as to the racially hostile work environment claim, John Morrell argues it is entitled to summary judgment in that the plaintiff cannot create a material question of fact as to the elements of the racially hostile

The Supreme Court instructs that hostile work environment harassment occurs when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted). By their nature, hostile work environment claims are not isolated incidents, but rather entail ongoing and repeated conduct. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). To establish a prima facie case of hostile work environment, Soto must show that: (1) she is a member of a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic, in this case, on her race; (4) the harassment affected a term, condition, or privilege of employment. *Beard v. Flying J. Inc.*, 266 F.3d 792, 797 (8th Cir. 2001); *Bradley v. Widnall*, 232 F.3d 626, 631 (8th Cir.2000); *see Carter v. Chrysler Corp.*, 173 F.3d 693, 700 (8th Cir.1999). Where the harassment was at the hands of a co-worker, and not a supervisor, the prima facie case includes a fifth element requiring the plaintiff to show that the employer knew or should have known of the harassment, but failed to take proper remedial action. *Stuart v. General Motors Corp.*, 217 F.3d 621, 631 (8th Cir.2000); *Jacob–Mua v. Veneman*, 289 F.3d 517, 522 (8th Cir.2002); *Rheineck v. Hutchinson Technology, Inc.*, 261 F.3d 751, 755–56 (8th Cir.2001); *Canady v. John Morrell & Co.*, 247 F.Supp.2d 1107, 1115 (N.D.Iowa 2003). Where the harassment is at the hands of the plaintiff's supervisor, but no tangible employment action resulted, an affirmative

defense described in the *Ellerth/Faragher* duo is available to the employer. *See Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807–08, 118 S.Ct. 2275. Leaving aside the implications arising from the fact that Tanner is a "supervisor," John Morrell contends in its motion for summary judgment that Soto cannot generate genuine issues of material fact on the "based on race" element or the "affecting a term or condition of employment" element, the third and fourth elements of the *prima facie* case, respectively.

Title VII recognizes an employees' entitlement to a workplace free of "discriminatory intimidation, ridicule, and insult" motivated by the employees' membership in a protected class. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Carter*, 173 F.3d at 700; *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir.1997). Use of racial epithets may give rise to an inference of discrimination based on race, as well as create an inference that racial animus motivated other conduct. *See Carter*, 173 F.3d at 701; *White v. Honeywell, Inc.*, 141 F.3d 1270, 1273, 1276 (8th Cir.1998); *Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 356 (8th Cir.1997). "All instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII if they are part of a course of conduct which is tied to evidence of discriminatory animus." *Carter*, 173 F.3d at 701.

"Harassment which is severe and pervasive is deemed to affect a term, condition, or privilege of employment." *Ross*, 293 F.3d at 1050 (citing *Faragher*, 524 U.S. at 786, 118 S.Ct. 2275). One-time incidents, unless severe, are insuffi-

---

work environment claim, and that in the alternative John Morrell is entitled to the *Ellerth/Faragher* affirmative defense.

cient to establish the level of harassment necessary to prove a hostile environment. *Id.* at 1051; *see Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 ("isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' ") (citation omitted). Further, sporadic and casual comments are also unlikely to support a hostile environment claim. *Cram v. Lamson & Sessions, Co.,* 49 F.3d 466, 474 (8th Cir.1995); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981).

 In support of her racially hostile work environment claim, Soto offers the following evidence:

1. There were a few occasions in which Tanner would reach out to Soto and wiggle his fingers while saying "muy bueno panoche" in front of other employees.

2. Tanner did not make sexually harassing comments in Spanish to non-Hispanic workers.

3. Soto's allegation that Tanner treated Hispanic women differently than other women.

Plaintiff's Brief at pg. 27–28; Defendant's Brief at pg. 33–34. The record is devoid of any other evidence that could possibly support the elements of a racially hostile environment. Even when viewed in the light most favorable to the plaintiff, the record does not generate genuine issues of material fact as to the racially hostile environment claim. First, genuine issues of material fact as to Tanner's motivation cannot be generated based merely on the fact that the sexual comments were made to Soto in Spanish, or by Soto's bare assertions in her complaint and resistance to defendant's motion for summary judgment that Tanner treated Hispanic women differently. Poignantly, Soto's deposition testimony refutes the assertion that Tanner treated Hispanic women differently:

Q: So, are you telling us that Tanner treats different minority groups some nice, some not nice?

A: Well, I—if you think that—if you think that what Tanner was doing to me was nice, I don't think so, okay?

\* \* \* \* \* \*

Q: I said does Tanner treat some women nice and other people not nice?

A: Well, if they think that that's nice, I don't know, because that's—

Q: How did he treat Martha?

A: Which Martha? There's two.

Q: Martha, the one who got—who pulled your earplugs off.

A: I don't know. I don't know. I wasn't—I really don't know how he treated her.

Q: Well, you told us he would stand with her and laugh—

A: Yeah.

Q: —and they'd look at you and they seemed to get along, didn't they?

A: Yeah.

Q: And she's—is she Hispanic?

A: Yeah.

Q: And he treated Flaca—

A: Yeah. She wanted to get in his pants. Yeah.

Q: And there were no problems there even though she was a Hispanic, right, their relationship was fine?

A: No. No. There was no problem because they were both the same. That's the way I see it.

Q: *And it doesn't really matter whether you were Hispanic or Asian, it really had to do with how he treated some women who liked to play games with him, right?*

A: *Mm-hmm.*

Defendant's Brief at pg. 34–35 (Deposition Testimony of Plaintiff Soto) (emphasis

added). Further, the allegations in the record, though abhorrent, are not severe or pervasive enough to sustain a racially hostile work environment claim. "The plaintiff cannot simply rely on these few isolated incidents and a general, unsupported allegation of a constant barrage of racial comments and ethnic slurs by [Tanner] to support [her] hostile work environment claim." *Gonzales v. Western Resources, Inc.,* 36 F.Supp.2d 1289, 1295 (D.Kan.1999); *see Elmahdi v. Marriott Hotel Serv., Inc.,* 339 F.3d 645, 653 (8th Cir.2003) (holding insufficient to sustain hostile work environment claim the fact that plaintiff was called "black boy" on a few occasions by coworker, and that a coworker made the comment that Africans had big penises); *Burkett v. Glickman,* 327 F.3d 658, 661–62 (8th Cir.2003) (finding mere assertion by plaintiff that supervisors and coworkers had used the word 'nigger' in front of employees other than plaintiff insufficient to establish a hostile work environment); *Gilbert v. City of Little Rock,* 722 F.2d 1390, 1394 (8th Cir. 1983) ("more than a few isolated incidents of harassment must have occurred"), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984); *Gonzales v. Western Resources, Inc.* 36 F.Supp.2d 1289, (D.Kan.1999) (making of derogatory remarks by supervisor in Spanish to Hispanic plaintiff, coupled with other sporadic incidents of racially derogatory comments, insufficient to survive defendant's motion for summary judgment on racially hostile environment claim). Accordingly, the defendant's motion for summary judgment as to the racially hostile work environment claim is granted.

### C. Quid Pro Quo Sexual Harassment

■ Both *quid pro quo* claims and hostile work environment claims are cognizable under Title VII, though hostile environment claims require that the harassment be pervasive or severe. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Ellerth,* 524 U.S. at 752, 118 S.Ct. 2257.

> A *quid pro quo* claim involves threats to retaliate against an employee if she denies [the harasser] some sexual liberties, and threats are carried out, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment. Thus, the terms *quid pro quo* and hostile work environment are helpful, perhaps, in making a rough demarcation between cases in which threats are carried out and those where they are not or are absent altogether.

*EEOC v. Am. Home Prods. Corp.,* No. C00–3079–MWB, 2001 WL 34008505, at *5 (N.D.Iowa Dec.21, 2001) (citations and internal quotations omitted); *see Ogden v. Wax Works, Inc.,* 214 F.3d 999, 1006 (8th Cir.2000) (noting that the terms 'quid pro quo' and hostile work environment are relevant only as an evidentiary distinction between cases in which threats are carried out and cases involving only generally offensive conduct).

■ To prevail on a *quid pro quo* claim, plaintiff Soto must prove the following four elements: "(1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; (3) the harassment was based on her sex; and (4) her submission to the unwelcome advances was an express or implied condition for receiving job benefits or her refusal to submit resulting in a tangible job detriment." *Cram v. Lamson & Sessions Co.,* 49 F.3d 466, 473 (8th Cir.1995) (citing *Kauffman v. Allied Signal, Inc.,* 970 F.2d 178, 186 (6th Cir.), *cert. denied,* 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992)); *see Ogden,* 214 F.3d at 1006 n. 8.

John Morrell predicates its asserted entitlement to summary judgement on the *quid pro quo* sexual harassment claim on two distinct grounds: (1) Soto's failure to exhaust administrative remedies as to the *quid pro quo* claim; and (2) even if Soto's *quid pro quo* claim is properly before the court, the record fails to generate a genuine issue of material fact as to the second and fourth elements of a *quid pro quo* sexual harassment claim. Each of these grounds will be addressed in turn.

### 1. Failure to exhaust administrative remedies

■ On November 5, 2001, Soto filed a charge of discrimination with the Iowa Civil Rights Commission (ICRC), which was cross-filed with the Equal Employment Opportunity Commission (EEOC). In her charge, Soto marked the following as grounds upon which she felt she was discriminated: National Origin; Race; Sex; and Retaliation. Defendant's Appendix, Doc. No. 31 at 000211. Soto also detailed particulars of the alleged types of harassment in an attached statement. Defendant's Appendix, Doc. No. 31 at 000215–000220. It is undisputed that plaintiff Soto does not use the legal term *quid pro quo* sexual harassment in her EEOC/ICRC charge, and that the charge originally filed has not been amended. Soto received right-to-sue letters from the ICRC and EEOC on January 18, 2002, and February 7, 2002, respectively. Soto filed her original complaint on March 16, 2002, and her amended complaint, which included charge of *quid pro quo* sexual harassment, on June 25, 2003.

■ In order to assert a Title VII claim, the plaintiff must have first exhausted their administrative remedies with respect to the claim by filing a charge with the EEOC. *Dorsey v. Pinnacle Automation Co.*, 278 F.3d 830, 838 (8th Cir.2002). The purpose behind filing a charge with the EEOC is to give the Commission an opportunity to investigate and try to resolve the controversy through conciliation before allowing the aggrieved party to pursue a lawsuit. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir.1988). "Because persons filing charges with the EEOC typically lack legal training, those charges must be interpreted with the utmost liberality in order not to frustrate the remedial purposes of Title VII." *Cobb*, 850 F.2d at 359 (citing *EEOC v. Michael Construction Co.*, 706 F.2d 244, 248 (8th Cir.1983)). Therefore, the scope of the subsequent action is not necessarily limited to the specific allegations in the charge. *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 886 (8th Cir.1998). A Title VII plaintiff is allowed to seek relief for "any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Nichols*, 154 F.3d at 887 (citing *Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 676 (8th Cir.1995) and *EEOC v. Delight Wholesale Co.*, 973 F.2d 664, 668 (8th Cir.1992)); *see also Kells v. Sinclair Buick–GMC Truck, Inc.*, 210 F.3d 827, 836 (8th Cir.2000). The Eighth Circuit Court of Appeals "deem[s] administrative remedies exhausted as to all incidents of discrimination that are 'like or reasonably related to the allegations of the [administrative] charge.'" *Hargens v. USDA*, 865 F.Supp. 1314, (N.D.Iowa 1994) (quoting *Tart v. Hill Behan Lumber Co.*, 31 F.3d 668, 671 (8th Cir.1994) (citations omitted). While a plaintiff's claim of discrimination should not be dismissed based on mere procedural technicalities, where the plaintiff only charges certain forms of discrimination without ever hinting at another claim, dismissal for failure to exhaust administrative remedies is proper. *See Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 223 (8th Cir.1994).

Therefore, "[t]he sweep of the administrative charge is as 'broad as the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination.'" *Simmons v. New Pub. Sch. Dist. No. Eight,* 251 F.3d 1210, 1216 (8th Cir.2001) (quoting *Kells,* 210 F.3d at 836))(quotations omitted).

John Morrell argues that Soto failed to exhaust her administrative remedies as to the *quid pro quo* sexual harassment claim. Specifically, John Morrell asserts that the *quid pro quo* claim is not 'likely or reasonably related' to the allegations in her EEOC/ICRC charge in two respects: (1) Soto's EEOC/ICRC charge didn't include allegations sufficient to meet the elements of a *quid pro quo* claim; and (2) *quid pro quo* sexual harassment is a distinct form of recovery that requires "the rebuffing of sexual advances or the refusal to engage in sexual favors resulting in some tangible job benefit," rather than "mere allegations of sexual conduct or sexual behavior." Defendant's Brief in Support of Motion for Summary Judgment ("Defendant's Brief"), Doc. No. 45, at pg. 26.

In her resistance, Soto counters that the allegations contained in her complaint are sufficient to put the EEOC, and John Morrell, on notice of both a hostile working environment claim and a *quid pro quo* claim. Specifically, Soto points to the fact that the charge specifically states: "I saw that all the women that went along with what was going on got favored and got easier jobs and all the other ones had to do the harder work." Plaintiff's Brief in Support of Resistance to Defendant's Motion for Summary Judgment ("Plaintiff's Brief"), Doc. No. 41 at pg. 23. Soto further asserts that the following statements in her charge give rise to an inference that female employees had to go along with Tanner's sexual behavior to be treated well:

Then there is Sida. She would wear sexy clothes to work and then she could miss any day or go home early. Tanner wouldn't even care. At one time I and other girls were in our locker room and I was upset cuz I got sick and sent home with high blood pressure and Tanner was mad a me. I told Sida about it and she said oh honey all you got to do is give Tanner a hug and a kiss and he will never tell you nothing. That's what I do and he'll just melt. I said hell no. I am not gonna kiss no one to make him happy. That's sexual harassment.

Plaintiff's Brief, Doc. No. 38 at pg. 24. Soto argues that she did not fail to exhaust her administrative remedies because the allegations in her charge, construed in light of the liberal interpretation accorded to administrative charges, establishes that the *quid pro quo* claim is 'reasonably related' to the allegations in her EEOC/ICRC charge.

John Morrell relies on *King v. M.R. Brown, Inc.,* 911 F.Supp. 161 (E.D.Pa. 1995), for the principle that claims of *quid pro quo* harassment and hostile work environment harassment are distinct, and cannot be 'reasonably related' for purposes of exhaustion as a matter of law. Defendant's Brief, Doc. No. 45 at 26. This court does not find *King* supportive of such an absolute conclusion. In *King* the plaintiff alleged that she was the victim of same-sex sexual harassment at the hands of female coworker Karen Leader, in both her EEOC charge and her first complaint. *King,* 911 F.Supp. at 164. In her second amended complaint the plaintiff sought to add the following claims: (1) hostile work environment created by employees other than Ms. Leader; (2) hostile work environment created by Ms. Leader engaging in *quid pro quo* harassment of female employees other than the plaintiff; and (3) *quid quo pro* harassment by male managerial staff members against the plaintiff.

*Id.* at 165. Based on a Third Circuit Court of Appeals case defining a hostile work environment claim as a 'single cause of action' the *King* court held that the first and second added claims were proper as they buttressed the original cause of action, but dismissed the third *quid pro quo* claim against male managerial staff members because it stated a different cause of action not previously raised with the EEOC. *Id.* at 165 (citing *West v. Philadelphia Elec. Co.,* 45 F.3d 744 (3d Cir.1995)). There are a couple of reasons why the court does not find *King* persuasive in this matter. First, the *King* decision was partially based on a Third Circuit holding defining hostile work environment claims as a 'single cause of action'; there is no such analogous holding by the Eighth Circuit Court of Appeals. *See id.* Second, the improper *quid pro quo* claim in *King* was against parties that appear to not have even been mentioned in the plaintiff's EEOC charge; here Soto alleges *quid pro quo* harassment at the hands of Tanner, the primary perpetrator mentioned in her charge. *Id.* at 164.

The Eighth Circuit Court of Appeals has found various Title VII claims unexhausted as not 'reasonably related' to the allegations in the administrative charge. *See, e.g., Russell v. TG Missouri Corp.,* 340 F.3d 735, 747–48 (8th Cir.2003) (holding retaliation claim not reasonably related to discrimination charges where EEOC complaint set forth retaliation as a motive for plaintiff's termination and not as a motive for plaintiff's overtime assignments); *Dorsey,* 278 F.3d at 838 (finding "claims for age discrimination based on failure to promote presented in [the] charge of discrimination not broad enough to encompass hostile work environment claim."); *Stuart,* 217 F.3d at 631 (advancing that where plaintiff alleged in EEOC charge that she was terminated in retaliation for engaging in protected activity, administrative remedies were not exhausted with respect to

claim that she was disciplined in retaliation for engaging in protected activity); *Kells,* 210 F.3d at 836 (finding verbal harassment claim not reasonably related to claims of discriminatory demotion and termination for purposes of exhaustion of administrative remedies); *Briley v. Carlin,* 172 F.3d 567, 572–74 (8th Cir.1999) (dismissing for failure to exhaust administrative remedies a failure-to-promote claim that was beyond the scope of the claims in the EEOC complaint); *Wallin v. Minn. Dep't of Corrections,* 153 F.3d 681, 688 (8th Cir.1998) ("it is well established that retaliation claims are not reasonably related to underlying discrimination claims"); *Shannon v. Ford Motor Co.,* 72 F.3d 678, 685–86 (8th Cir. 1996) (affirming district court determination that failure-to-promote claim was not reasonably related to sex-discrimination charges filed with the EEOC). Notably, in no instance has the Eighth Circuit, or one of its subsidiary district courts, held that a *quid pro quo* harassment claim was not reasonably related to a hostile environment claim. At the same time, it is clear that Soto "may not make a conclusory statement of sex discrimination in the charge and then file suit on whatever facts or legal theory she may later decide upon." *Faibisch v. Univ. of Minn.,* 304 F.3d 797, 803 (8th Cir.2002).

■ As there is no precedent mandating a finding that a *quid pro quo* claim is unrelated to a hostile environment claim, the issue remaining is whether Soto's claim of *quid pro quo* harassment can be considered 'like or reasonably related' or 'growing out of' Soto's allegations of a sexually hostile work environment as described in her administrative charge. When liberally construed, in order to further the remedial purposes of Title VII and its prohibition against unlawful employment practices, *Stuart,* 217 F.3d at 630–31, Soto's claim of *quid pro quo*

harassment is sufficiently 'like or reasonably related' to her claim of a sexually hostile work environment. While it is settled that a legal distinction between *quid pro quo* claims° and hostile environment claims exists, the fact that judges and legal scholars have felt the need to bring attention to the fact that a distinction does indeed exist, lends to a finding that the claims are surely reasonably related under the liberal construction afforded an EEOC/ICRC charge written by a lay person. *See Ellerth,* 524 U.S. at 749, 118 S.Ct. 2257; *Meritor Savings Bank,* 477 U.S. at 65, 106 S.Ct. 2399; *Am. Home Prods. Corp.,* 2001 WL 34008505 at *5. Further, in a 'supervisor harassment' case, which both parties claim that this case is, the distinction between *quid pro quo* and hostile environment claims distills down into nothing more than an evidentiary distinction. *Ellerth,* 524 U.S. at 749, 118 S.Ct. 2257; *Fisher v. Electronic Data Sys.,* 278 F.Supp.2d 980, 987, 2003 WL 21995186(S.D.Iowa Aug.8, 2003) ("Since *Ellerth,* the critical question, regardless of how the plaintiff articulates her claims, is whether a "tangible employment action" occurred.") (citations omitted). Specifically, the court finds that the *quid pro quo* claim could reasonably grow out of an investigation into Soto's claims that she "saw that all the women that went along with what was going on got favored and got easier jobs and all the other ones had to do the harder work," and the incident with Sida in which she was counseled to give Tanner a hug and a kiss to get better treatment. Plaintiff's Brief at 23–24. Also noteworthy is the fact that both the *quid pro quo* and hostile environment claims grow out of conduct by the same key person, Tanner, and they are not distanced in time from each other. *See Nichols,* 154 F.3d at 887. If this court has determined, as it has, that Soto's *quid pro quo* claim grew out of her claims in her EEOC and ICRC charges, John Morrell

asserts that it is still entitled to summary judgment on the *quid pro quo* claim as the plaintiff has failed to generate genuine issues of material facts as to two elements of the *prima facie* case.

### 2. Failure to generate issues of material fact as to the elements of the claim

### a. Unwelcome sexual advances or requests for sexual favors

■ The second element of a *prima facie* case of *quid pro quo* harassment is that the plaintiff be subjected to unwelcome sexual advances or requests for sexual favors. Both parties agree that Tanner never made any explicit requests for sexual favors from Soto. The dispute basically centers on what qualifies as a sexual advance or implicit sexual request. John Morrell predictably argues that the allegations in the record do not amount to sexual advances or requests for sexual favors, and further seeks to capitalize on the fact that during the plaintiff's deposition she sometimes answered that she was unsure whether the alleged conduct was a request for sexual favors. In her resistance, Soto argues that the record is replete with verbal statements and physical conduct of a sexual nature.

■ Looking at the facts in the light most favorable to the plaintiff, the court finds that genuine issues of material fact are generated by record evidence. John Morrell's argument neglects the fact that the element is read in the disjunctive: there must be *either* requests for sexual favors *or* sexual advances. The record details the following alleged incidents which could be categorized as sexual advances or implicit requests for sexual relations:

- When Tanner saw the hickey on Soto's neck, he said he was jealous and that he was going to find out who gave it to

her. Tanner continued to comment on the hickey for the next several weeks.

- On a couple occasions, without provocation, Tanner gave Soto his phone number and asked her to call him.
- On a couple of occasions, Tanner came up to Soto while she was working on the line, took her hand and continued to hold her hand as he walked her across the kill floor to an office.
- Tanner untied her apron while she was working on the line, requiring Soto to find someone else to retie it for her.
- On a couple occasion Tanner walked up behind Soto unannounced and grabbed her calves.
- On a number of occasions, Soto would look behind her to find Tanner, and other kill floor foremen, standing a few inches away from her buttocks, staring at her.
- A couple of times, in the presence of male coworkers, Tanner said "muy bueno panoche" to Soto while reaching out his hand and wiggling his fingers.
- Tanner made a comment that he 'eats pussy all night long,' while looking at Soto.
- Tanner would 'throw' Soto kisses, or make kissing movements with his lips while looking at her.

In examining the record, it is important to realize that just because the alleged behavior was inappropriate, does not mean that it amounted to a request for sexual favors or a sexual advance. *See Cram*, 49 F.3d at 473 (finding no issue of material fact as to the second prong of the *quid pro quo* analysis where plaintiff's supervisor "did not make any *sexual* comments, advances or requests after their consensual relationship ended," and record did not demonstrate that whatever nonsexual advances occurred were unwelcome); *Petrone v. Cleveland State Univ.*, 993 F.Supp. 1119, 1129 (N.D.Ohio 1998), *disap-*

*proved of on other grounds in Kovacevich v. Kent State Univ.*, 224 F.3d 806 (6th Cir.2000). In this regard, some courts have found the behavior alleged to support a *quid pro quo* claim, while unsavory, was insufficient to establish this element of the plaintiff's *quid pro quo* claim. *See Romero v. Caribbean Restaurants, Inc.*, 14 F.Supp.2d 185, 189 (D.Puerto Rico 1998) (determining that evidence that supervisor winked at plaintiff and made lewd comment in plaintiff's presence and where no physical touching occurred, amounted only to teasing and did not establish 'request for sexual favors' element); *Petrone*, 993 F.Supp. at 1129 (holding allegations that supervisor discussed his relationships with plaintiff, wrote poems to the plaintiff, requested that plaintiff go for a walk with him or to dinner, and on one occasion touched plaintiff's leg, insufficient to establish the 'request for sexual favors' prong of the *prima facie* case); *Swinson v. Tweco Prods., Inc.*, No. 89–1531–K, 1992 WL 190686 at *7 (D.Kan. July 17, 1992) (finding 'request for sexual favors' element of *quid pro quo* case not established where supervisor never "touched plaintiff in a sexual manner or threatened to engage in sexual activity."). Equally important, however, is the realization that incidents that may merely be nothing more than 'inappropriate' standing alone, when considered cumulatively, can generate genuine issues of material fact as to this element. *See Delaria v. Am. General Finance, Inc.*, 998 F.Supp. 1050, 1063 (S.D.Iowa 1998) (finding "[supervisor's] having looked up [plaintiff's] dress and winked at her, combined with the three times he put his arm around [plaintiff]" sufficient to generate issue of material fact that supervisor was making sexual advances or requests of the plaintiff). Viewing the allegations in the light most favorable to the plaintiff, and taking the allegations as a whole, rather than viewing them in isolation, the court

finds that Soto has generated genuine issues of material fact as to whether Tanner was making sexual advances towards her or requesting sexual favors from her. Accordingly, summary judgment on the issue of whether the plaintiff was subjected to sexual advances or requests for sexual favors is denied.

### b. *Express or implied conditioning of benefits or refusal resulting in detriment*

The fourth element of a *quid pro quo* sexual harassment claim is read in the disjunctive, and requires that *either* job benefits were conditioned on submission to the harasser's sexual requests or advances, *or* that refusal to submit resulted in a tangible job detriment. *See Am. Home Prods. Corp.*, 2001 WL 34008505 at *9 n. 2 (reading the fourth element of a *quid pro quo* harassment claim to "encompass both the situation in which the plaintiff received a job benefit *only after she submitted* to the harasser's demands, and the situation in which the plaintiff *did not submit* and was subjected to a job detriment."). In this instance Soto asserts that she never submitted to Tanner's 'demands,' and therefore the viability of her *quid pro quo* claim lies in a determination of whether genuine issues of material fact have been raised that she suffered a tangible job detriment for refusing to submit to Tanners advances. On this front, Soto claims that she suffered the following tangible job detriments: (1) Tanner yelled at her more than he did at other women who went along with his sexual antics; (2) She was given harder jobs than those who submitted to his advances; (3) Tanner gave her fewer, and shorter, breaks; and (4) Tanner fired her. John Morrell argues that Soto was never fired, as Tanner lacked the authority to fire her, and further that "being yelled at more and not being given long breaks is [sic] not a tangible job detriment." Defendant's Brief, Doc. No. 45 at

pg. 30. John Morrell does not dispute that if Soto had in fact been 'truly' fired, that termination would constitute a tangible job detriment. For the reasons discussed *supra*, part III.A.1, while Tanner's firing of Soto does not amount to a tangible job detriment due to the factual circumstances surrounding the timing of Soto's return to John Morrell from her absence, a genuine issue of material fact has been raised as to the denial of bathroom breaks, or whether giving Soto much shorter bathroom breaks than other female coworkers on the same line, constitutes a tangible job detriment. Therefore, viewing the record in the light most favorable to the plaintiff, the court concludes that genuine issues of material fact have been generated as to whether Soto suffered a tangible job detriment as a result of her refusal to submit to Tanner's sexual advances.

### D. *Retaliation*

John Morrell also claims it is entitled to summary judgment on Soto's Title VII retaliation claim. Under Title VII, an employer is forbidden to retaliate against employees for opposing sexual discrimination. 42 U.S.C. § 2000e–3(a); *Bogren v. Minnesota*, 236 F.3d 399, 407 (8th Cir. 2000). Based on the statutory language, the Eighth Circuit Court of Appeals distinguishes the types of retaliation prohibited by Title VII into two classes: (1) Opposition—retaliation against an employee for "opposing any practice made unlawful by Title VII"; and (2) Participation—retaliation against an employee for "participating in an investigation under Title VII." 42 U.S.C. § 2000e–3(a). In this instance, Soto claims she was wrongfully retaliated against for opposing a practice made unlawful by Title VII.

The Eighth Circuit Court of Appeals has held that the *McDonnell Douglas* burden-shifting framework applies to

retaliation claims under Title VII. *Buettner v. Arch Coal Sales, Inc.*, 216 F.3d 707, 713–714 (8th Cir.2000); *see Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994). The first step in this framework is the establishment of a *prima facie* case by the plaintiff. *Buettner*, 216 F.3d at 713–14. To establish a prima facie case of retaliatory discrimination, Soto must establish the following four elements:

(1) [she] engaged in activity protected by Title VII; (2) an adverse employment action occurred; and (3) a causal connection between participation in the protected activity and the adverse employment action. *Id.* at 713–14. (citations omitted).

*Gagnon v. Sprint Corp.*, 284 F.3d 839, 850 (8th Cir.), *cert. denied*, 537 U.S. 1001, 123 S.Ct. 485, 154 L.Ed.2d 396 (2002); *see Sowell v. Alumina Ceramics, Inc.*, 251 F.3d 678, 685 (8th Cir.2001); *Buettner*, 216 F.3d at 713–714. In addition to these requirements, the plaintiff must show that a reasonable person could believe that the alleged incidents would violate Title VII's standard. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)

John Morrell asserts that Soto fails to establish the second and third elements of her *prima facie* case for retaliation because she cannot demonstrate she suffered an adverse employment action or that the asserted adverse action was causally related to her complaints of sexual harassment. Specifically, John Morrell argues that the following allegations by Soto do not rise to the level of an adverse employment action and are not casually related to her complaints: (1) Tanner treated Soto differently, and embarrassed her in front of coworkers, after discovering that she was dating Gonzalez, a coworker; (2) Tanner threatened to fire her when Soto went to Human Resources to complain about a female coworker taking Soto's earplugs off when Tanner did not reprimand the of-fending employee for this unwanted act; (3) Tanner restricted Gonzalez from coming onto the kill floor to see Soto; and (4) Tanner fired her. Defendant's Brief at pg. 38–39.

In *Cherry v. Menard, Inc.*, 101 F.Supp.2d 1160 (N.D.Iowa 2000), this court explained the "adverse employment action" element as follows:

[N]ot everything that makes an employee unhappy is an actionable adverse action. [T]he adverse action does not have to be a discharge, [but] the allegedly retaliatory conduct must nonetheless be " 'more disruptive than a mere inconvenience or an alteration of job responsibilities' [or][c]hanges in duties or working conditions that cause no materially significant disadvantage." In *Kim*, the Eighth Circuit Court of Appeals explained that what the court must look for is "the kind of serious employment consequences that adversely affected or undermined [the employee's] position, even if [s]he was not discharged, demoted or suspended." *Kim*, 123 F.3d at 1060. Furthermore, the court may examine the cumulative effect of the employer's allegedly retaliatory actions, rather than determining whether any individual action upon which the claim relies was sufficiently adverse.

*Id.* at 1185–86. (citations and quotations omitted). Clearly, the facts that Tanner treated Soto differently after finding out she had a boyfriend, and restricting Gonzalez from coming onto the kill floor do not qualify as 'adverse employment actions.' *See Montandon v. Farmland Indus.*, 116 F.3d 355, 359 (8th Cir.1997) (reiterating that not everything that makes an employee unhappy amounts to an actionable adverse employment action). Tanner's threats of termination when Soto went to Human Resources, where no adverse action or tangible alteration of her job re-

sponsibilities resulted from those threats, also fails to meet the threshold requirements of an actionable adverse employment action. *See Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 715 (8th Cir.2000) ("Employment actions that do not result in changes in pay, benefits or responsibility are insufficient to sustain a retaliation claim.")(citing *Flannery v. Trans World Airlines, Inc.,* 160 F.3d 425, 428 (8th Cir.1998)). The only allegation that could rise to the level of an actionable adverse employment action is Tanner's 'firing' of Soto. On this point, John Morrell argues that even though Tanner told Soto's boyfriend she was fired, she was never in fact fired from John Morrell, nor did she lose any pay or benefits, and therefore it doesn't amount to an adverse employment action. Defendant's Brief at pg. 41. Soto counters this argument with the fact that if Soto had not come in to collect her paycheck she would have been 'officially' fired, and that her belief that Tanner had the authority to fire her was reasonable as she had interpreted for Tanner on several occasions in which he fired other employees. Plaintiff's Brief at pg. 31. Therefore, under Soto's rendition of the facts, though she did not suffer a loss in income, benefits or seniority, and was not actually terminated from John Morrell, Tanner's 'mock' termination rises to the level of an actionable adverse employment action. The record clearly shows, and Soto *does not dispute,* that she did not lose pay, benefits or seniority as a result of Tanner's action. Even if Soto reasonably believed that Tanner had the power to terminate her, and that Tanner did in fact tell her she was terminated, there is no actionable adverse employment action where the acts did not amount to a material employment disadvantage. *See Buett-*

*ner,* 216 F.3d at 715 (finding no adverse employment action where plaintiff offered no evidence that the confrontation with her supervisor resulted in a materially significant disadvantage); *Flannery,* 160 F.3d at 427 (finding no adverse employment action where there was no allegation that employer's actions resulted in "reduced salary, benefits, seniority, or responsibilities.") The circumstances of this situation also lead to such a conclusion. At the time that Gonzalez relayed to Soto that she was fired, she was out of town attending to a family emergency. Soto went into Human Resources the *day after* she returned from her trip, approximately five days after learning through Gonzalez that she had been fired, and learned that she was not in fact fired and that Tanner had no authority to fire her. As Soto discovered that she was still employed, with no loss of benefits, seniority or wages, on the date that she would naturally have returned to work following her absence, the court cannot say that she was materially disadvantaged by Tanner's actions. As the plaintiff has failed to generate material questions of fact on the existence of an actionable adverse employment action, John Morrell is entitled to summary judgment on the plaintiff's retaliation claim.[14]

### E. *Iowa Civil Rights Act Claims*

▮▮▮▮ In addition to her Title VII claims, plaintiff Soto claims sexual harassment, racial harassment, *quid pro quo* harassment and retaliation under the Iowa Civil Rights Act (ICRA) in Count V of her complaint. IOWA CODE CH. 216. It is widely accepted in the Eighth Circuit that generally no distinction is made between claims based on federal law and comparable state law claims under the ICRA. *See*

---

14. As the record evidence fails to generate material questions of fact regarding the adverse employment action, the court need not reach the defendant's contention that Soto's retaliation claim fails for failure to establish a 'causal connection' between the complaints of harassment and the alleged retaliatory acts.

*Hannoon v. Fawn Eng'g Corp.*, 324 F.3d 1041, 1046 (8th Cir.2003) (addressing plaintiff's state civil rights claims under the ICRA together with plaintiff's Title VII claims); *Beard v. Flying J, Inc.*, 266 F.3d 792, 798 (8th Cir.2001) ("We evaluate [the plaintiff's] claims under Title VII and under the Iowa Civil Rights Act using the same legal principles.")(citing *Falczynski v. Amoco Oil Co.*, 533 N.W.2d 226, 230 & n. 2 (Iowa 1995)). This is predicated on the fact that the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA. *See Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) ("The ICRA was modeled after Title VII of the United State Civil Rights Act. Iowa courts therefore turn to federal law for guidance in evaluating the ICRA."). However, federal law is not controlling, but merely provides an analytical framework for analyzing ICRA claims. *Hulme v. Barrett*, 449 N.W.2d 629, 631 (Iowa 1989). "Federal law should not substitute the language of the federal statutes for the clear words of the ICRA." *Peda v. Am. Home Prods. Corp.*, 214 F.Supp.2d 1007, 1015 (N.D.Iowa 2002) (citation omitted).

As retaliation claims under the ICRA are evaluated under the same standards as the federal retaliation claim, coupled with the fact that summary judgment was granted on the Title VII retaliation claim based on the plaintiff's inability to generate genuine issues of material fact as to the elements, summary judgment is similarly granted as to the ICRA retaliation claim. *See Hulme v. Barrett*, 449 N.W.2d 629, 633 (Iowa 1989) (deriving the three-factor test used to analyze retaliation claims from federal decisions of Title VII retaliation claims).

With regard to the racially hostile work environment, sexually hostile work environment, and *quid pro quo* harassment claims the Iowa Supreme Court has ac-cepted the analysis of comparable claims under Title VII, with the major exception being that "the Iowa Supreme Court has never adopted the *Ellerth/Faragher* model for vicarious liability of an employer for [ ] harassment by a supervisor," instead relying on the "known or should have known" standard for assessing liability. *Stricker v. Cessford Construction Co.*, 179 F.Supp.2d 987, 1014 (N.D.Iowa 2001); *see McElroy v. State*, 637 N.W.2d 488, 499 (Iowa 2001) (using federal case law to flesh out the distinction between *quid pro quo* harassment and sexually hostile work environment claims under the ICRA); *Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 38 (Iowa 1993) (analyzing propriety of a sexually hostile work environment claim under the ICRA using the same factors as employed by federal courts in analyzing comparable claims under Title VII); *Lynch v. City of Des Moines*, 454 N.W.2d 827, 833–34 (Iowa 1990) (recognizing that the elements of Title VII sexually hostile work environment claims apply to ICRA sexually hostile work environment claims); *Chauffeurs, Teamsters and Helpers, Local Union No. 238 v. Iowa Civil Rights Commission*, 394 N.W.2d 375, 378 (Iowa 1986) (adopting elements of *prima facie* case of racial harassment under Title VII as the elements of a racial harassment claim under the ICRA). The non-recognition of the *Ellerth/Faragher* defense does not impact the determination of the racially hostile work environment claim, as summary judgment was granted on the federal claim due to the plaintiff's failure to generate material fact issues as to the elements of the *prima facie* case. Likewise, summary judgment is therefore granted as to the racial harassment claim under the ICRA. The non-recognition of the *Ellerth/Faragher* affirmative defense also does not impact the survival of a *quid pro quo* claim under the ICRA. The federal *quid pro quo* claim survived summary judgment as the plain-

tiff had generated genuine issues of material fact as to the elements of the claim. Accordingly, summary judgment as to the *quid pro quo* claim under the ICRA is denied.

██ As summary judgment was denied on the Title VII sexually hostile work environment claim based primarily on questions surrounding the availability of the *Ellerth/Faragher* affirmative defense, the fate of the ICRA sexually hostile work environment claim is slightly less predictable. In its motion for summary judgment, John Morrell recognizes that the *Ellerth/Faragher* affirmative defense does not apply, and rather argues that it is entitled to summary judgment on the ground that Soto cannot satisfy the fifth element of a hostile work environment claim under the ICRA: that the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action. *See Lynch*, 454 N.W.2d at 833 (listing the elements of a hostile work environment claim under the ICRA). Specifically, John Morrell argues that it took prompt and reasonable action in that:

> John Morrell immediately met with Soto, asked her to submit in writing a detailed description of the harassment, promptly conducted a detailed investigation which included interviewing the alleged harasser and potential witnesses, asked Soto for her input as to what John Morrell's response to the harassment should be, and ultimately terminated the alleged harasser.

Defendant's Brief, Doc. No. 45 at pg. 44. Soto counters with the argument that she complained to Tanner and Human Resources about the harassing behavior, and that John Morrell did not fire Tanner until four months after Soto first reported his behavior. In regard to this fifth element of the case, the Iowa Supreme Court has stated that it "places a reasonable duty on an employer who is aware of discrimination in the workplace to take reasonable steps to remedy it." *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 634 (Iowa 1990). The manner in which John Morrell responded to Soto's complaints is well-documented in the record, and if that were the only remaining question, it could warrant entry of summary judgment for the defendant. However, the court finds that there are still genuine issues of material fact as to when the defendant 'knew or should have known' of the harassment. The record shows that Soto complained about Tanner to Human Resources, albeit without specifically disclosing his sexual harassment, on a couple of occasions before she quit in July 2001. The record also shows the Soto complained directly to Tanner, as well as to her direct supervisors, some of whom had engaged in sexually harassing the plaintiff. Further, according to Steve Joyce, if a foreman or supervisor witnessed, or was told of, sexual harassment, they were to report it to Human Resources. Plaintiff's App., Doc. No. 38 at 31. Accordingly, material issues of fact have been raised as to whether John Morrell knew or should have known of the harassment at some time earlier than the date that Soto quit her employment with John Morrell in July 2001. Accordingly, summary judgment on the ICRA sexually hostile work environment claim is denied.

## IV. CONCLUSION

For the reasons stated above, John Morrell's motion for summary judgment is **granted in part and denied in part**. Soto has generated genuine issues of material fact on her claims of sexually hostile work environment and *quid pro quo* sexual harassment under Title VII, and therefore John Morrell's motion for summary judgment is **denied** as to Counts I and V. Further, summary judgment is also **denied** as to claims of sexually hostile work envi-

ronment and *quid pro quo* harassment under the ICRA contained in Count IV. However, as Soto has failed to generate genuine issues of material fact on her claims of racially hostile work environment and retaliation, John Morrell's motion for summary judgment is **granted** as to Counts II and III. Summary judgment is likewise **granted** as to any claims of racial harassment and retaliation under the ICRA in Count IV.

IT IS SO ORDERED.